JOHN VAN DYKE, ABRAHAM VAN DYKE, THOMAS ROBINSON AND SUSAN his wife, late SUSAN VAN DYKE AND ELIZA VAN DYKE.

*vs.*

KENSEY JOHNS.

*New Castle, Aug. T.* 1819.

The defendant, an adm'r of N. V. D., dec'd, sold, pursuant to an order of the Orphans' Court, certain lands of his intestate, for the payment of debts. At the sale the lands were bid off by G. M., for the defendant and at his request. The sale being returned to the Orphans' Court and confirmed by it, the lands were conveyed by the defendant, as adm'r of the intestate, to G. M. the bidder, and were subsequently re-conveyed by G. M. to the defendant, in fee simple. Upon a bill filed by the heirs at law of N. V D., dec'd, the intestate, to charge the lands with a trust for their benefit : *Held,*

1. That, upon the evidence, there was no *express* trust of the lands for the heirs at law—there being no proof of any declaration of trust between the parties ; neither of any declaration in writing, under the Statute of 29, *Car. II. Ch.* 3 ; nor of any declaration by parol, supposing that Statute not to be in force in this State.

2. That there was no trust *by legal implication*—there being no considera-
tion between the parties which is necessary in order to raise a use
upon a legal estate created by deed of bargain and sale—by which
mode of conveyance the present title was made.

3. That the rule of equity that a trustee cannot purchase the trust estate is
subject to some limitations. The English decisions seem to hold that
such purchase, made through a third person, where creditors are the
*cestuis que trust*, may afterwards be sanctioned by the Court, with the
assent of a majority of the creditors. In the present case, the estate
of the decedent being insolvent, his creditors, supposing there to be a
trust, are *cestuis que trust*, prior in right to his heirs at law. The
creditors have never objected to the sale and are not parties to this
suit. The interest of the creditors and their non joinder, are alone a
fatal objection to the bill.

4. That any equity of the complainants would have been lost by long delay
and acquiescence in the defendant's title—the bill having been filed
nearly thirty years after the lands were conveyed to the defendant, and
twelve years after the youngest of the heirs at law had attained
twenty-one years of age.

5. That the confirmation of the sale by the Orphans' Court, on the return
thereof, was conclusive of title under the same, except upon appeal.
The Orphans' Court is a court of public and general jurisdiction, and
its proceedings cannot be impeached collaterally.

BILL IN EQUITY, TO ENFORCE A TRUST OF REAL ESTATE.—
The defendant, Kensey Johns, as the administrator of
Nicholas Van Dyke, deceased, sold, in execution of an
order of the Orphans' Court of New Castle County, cer-
tain real estate of the decedent, for the payment of his
debts. The order for the sale was granted by the Orphans'
Court on the 21st July, 1789, upon the petition of the
defendant as administrator, in the usual form, setting forth
the insufficiency of the personal estate of the decedent to
discharge his debts and praying an order for the sale of
his real estate pursuant to the statute in that behalf. The
premises were exposed to sale, in several parcels, on the
3rd October next following, and the whole were struck off
to George Monro, he being the highest and best bidder
therefor, at the gross sum of £1,617. There were written
conditions of sale in the usual form, specifying the terms

and mode of payment of the purchase money and the time for the delivery of possession of the premises. The right to purchase at the sale, either directly or by a third person, was not granted to the administrator by the Court, nor reserved in the conditions of sale, nor was any such purpose publicly announced at the sale. The administrator made due return of the sale to the Orphans' Court on the 6th October, 1789 ; and, no one appearing to object, the same was confirmed by the Court. On the 12th October, 1789, the defendant, as administrator of Nicholas Van Dyke, dec'd, executed and delivered to George Monro, as the purchaser, a deed conveying to him the interest and estate of the decedent in the premises sold, and on the next day, the 13th October, George Monro re-conveyed the same premises to the defendant, his heirs and assigns. The administrator, in an administration account passed the 6th April, 1790, duly charged himself with the amount of the purchase money, to wit, the sum of £1,617.

The present bill was filed on the 29th August, 1817, by the complainants, as children and heirs at law of the decedent, Nicholas Van Dyke. All the surviving children joined in the bill except Nicholas Van Dyke, the oldest son, and Ann, the wife of the defendant, who was a daughter of the decedent. It set forth the facts already stated, touching the decease of Nicholas Van Dyke, the grant of administration of his estate to the defendant, the application by him for an order of the Orphans' Court to sell the decedent's real estate, the granting of the said order, the sale of the premises, the return and confirmation of said sale, the conveyance of the premises to George Monro as the purchaser, and the re-conveyance of the same to the defendant. The bill then charged, that George Monro bid at said sale on behalf of the administrator and at his request; that Monro was only a nominal purchaser, whose name was used as the mere medium for conveying title to the administrator; and that the defendant represented to Monro,

as well as to other persons present at the sale, that his object in seeking to buy in the real estate was to benefit the heirs of the decedent and not for his own advantage. The bill insisted that " the administrator acting as a trustee in rela-" tion to said real estate and the sale thereof, no purchase " made by said administrator to enure to his own benefit " could be valid, or could be supported on any principle of " equity ; it being an equitable rule that he who undertakes " to act for another in any matter, shall not, in the same " matter, act for himself ; from which is evidently deduci-" ble the natural inference that a trustee to sell shall not " gain any advantage by becoming himself the purchaser." The complainants, therefore, claimed that in equity a trust of the lands purchased was, by the very nature of the transaction, implied for the benefit of those whose interests were entrusted to the defendant. The prayer of the bill was, that the defendant might be decreed to be a trustee of the lands and premises purchased by him ; that he should hold the same in trust for the benefit of the complainants ; and that he should account to them for the rents, issues and profits thereof ; and for general relief.*

The answer of the defendant admitted the general facts set forth in the statement of the case above given, as they occurred from the decease of Nicholas Van Dyke, until the sale of his real estate by the defendant as his administrator. The answer was very voluminous in its statements, many of which did not prove to be material to the questions de-cided by the Chancellor. The main issue of fact, upon which the controversy ultimately turned, was upon the defendant's denial of the allegation made in the bill, touching the object

---

*In addition to the case made by the bill respecting the real estate, there were allegations of errors in the accounts of the administrator touching the personal estate, and a prayer for a further account of the personal estate. But this branch of the case was not urged in the argument, and passed with-out notice by the Court. It is, therefore, omitted from this report, it being wholly distinct from the main subject at issue, viz : the alleged trust of the real estate.

for which he had purchased the premises in dispute. The defendant positively denied that he made said purchase for the benefit of the heirs at law of the decedent, Nicholas Van Dyke, or that at the sale of the premises he represented to George Monro, or to any other person or persons, that he was seeking to buy in the premises for the decedent's heirs at law. And the defendant alleged that he bought the premises in good faith on his own account, and had raised the means of paying the purchase money by the sale of his own real estate previously held. The answer further alleged that the sale of the premises in controversy was conducted fairly ; that many persons attended ; that there was a competition in bidding, chiefly among creditors ; that an agent attended for the purpose of securing some particular debt ; that a certain Mary Laroux, a wealthy creditor, was present and active in bidding; and that the premises sold for as much as could prudently have been given for them, under the circumstances, one farm being encumbered with a dower, and the whole being in bad repair without means to improve them ; that it was certain the amount of sales was at least one half more than it would have been if the defendant had not interfered, but had left the estate to be sold by the sheriff; that no objection had been made, on the return of the sale, by any creditor or other person ; that the value of the lands was better known then than it is now.

The answer further set forth, at great length, a history of the Van Dyke family, of the decedent's insolvency, of the defendant's transactions with the family and his efforts to aid them, of his negotiations with the creditors to save the estate from sacrifice, of the circumstances under which he consented to become the administrator, the mode in which he raised the purchase money of the real estate in controversy, and other matters which, as they do not bear upon the questions treated in the opinion of the Chancellor, are not here set forth.

Besides the defence upon the merits before stated, the answer insisted upon several other grounds of defence, as follows : 1. That the widow and all the heirs of the decedent had always recognized his title to the real estate, and had ratified and confirmed the same by sundry acts, which were in the answer particularly set forth. 2. That the heirs had, for a long series of years, silently and without any notice of their pretended claim, permitted the defendant to expend large sums of money continuously in the repair and improvement of the real estate. 3. That the complainant had a remedy at law. 4. That the remedy of the complainants (if any) was extinguished by lapse of time; and the defendant claimed the benefit of the several acts of limitation of the State of Delaware.

Issues were joined and depositions taken by both parties. The only evidence material to the issues of fact raised and considered by the Chancellor, was that of George Monro, the bidder at the sale. His testimony is fully set forth in the opinion of the Chancellor.

The cause came before the Chancellor, at the April Term, 1819, for a hearing upon the bill, answer, exhibits and depositions. After the reading of the record the case was submitted to the Chancellor upon written arguments by counsel.*

*Read, Sr., McLane* and *Read, Jr.,* for the complainants.

The defendant is chargeable with a trust of these lands on two grounds ;

1. The trust is *express.* George Monro purchased the property expressly for the widow and children. He conveyed it without consideration to the defendant, who

*The arguments of counsel in this case are drawn out at considerable length, and embrace many points which were not considered in the opinion of the Chancellor. The present report is an abstract only of the arguments upon questions ultimately decided.

thereby took it subject to the trust with which Monro's purchase clothed it. The defendant is affected by the acts and understanding of George Monro, because it was at his instance and request that Monro made the purchase. The proof of what is here stated is found in the positive testimony of George Monro, corroborated by the general circumstances of the case. But,

2. The trust is conclusively established *by legal implication.* The rule of equity is, that a trustee cannot be a purchaser of the estate which he holds in trust. 2 *Powell on Cont.* 195 : 2 *Fonb. Eq.* 187 : 7 *Bac. Abr.* ( *Wilson's Ed'n*), *Uses and Trusts,* 181–2 : *Newland on Cont.* 459 : 1 *Mad. Ch. Pr.* 91 : *Sugd. on Vend.* 391. This is a rule of public policy, depending, not upon the circumstances of the case, but upon general principles. However honest the circumstances of any individual case, the general interests of justice require the purchase to be avoided; Lord Eldon, in 8 *Ves. Jr.* 345. The reason is, " *emptor emit quam minimo potest ; vendor vendit quam maximo potest.*" There need be no proof of fraud or circumvention. It is the character sustained by the purchaser which is the foundation of the rule. *Ex parte Bennet,* 10 *Ves. Jr.* 385 : *Sanderson vs. Walker,* 13 *Ves. Jr.* 603 : 1 *Sch. & Lef.* 127 : 2 *Binn. Rep.* 296 : 3 *ib.* 54. In *Cookson vs. Whelpdale,* 1 *Ves. Sr.* 9, the validity of a purchase by a trustee was made to depend upon the assent of a majority of the creditors. But that limitation upon the rule has since been strongly disapproved of by Lord Eldon, in *Ex parte Lacey,* 6 *Ves. Jr.* 628. With respect to persons not *sui juris* the rule is, if possible, the more stringent. In such cases, the trustee can make himself a purchaser only by filing a bill in equity and obtaining the sanction of the Court. *Campbell vs. Walker,* 5 *Ves. Jr.* 678 : *Sugd. on Vendors* 401.

But it is objected that the proceedings in the Orphans' Court preclude inquiry into the sale. To this we answer that the Orphans' Court has no jurisdiction of frauds and

trusts. The claim of the complainants is not inconsistent with the proceedings in the Orphans' Court. It only seeks to set up a trust founded on those proceedings. The deed to the defendant conveying the estate to which the trust attaches, was executed subsequently to the proceedings referred to. It may, however, be well argued that proceedings of the Orphans' Court can be examined in a collateral suit. It is a court of limited and special jurisdiction, created by statute. *Messenger vs. Kentner,* 4 *Binn. Rep.* 104 : *Snyder vs. Snyder,* 6 *ib.* 490.

Another defence rests on the Acts of Limitation, or the equitable bar by analogy to them. But equity does not apply these acts to trusts, and no length of time will bar a fraud. 1 *Fonb. Eq.* 328–9 : 1 *Mad. Ch. Pr.* 63, 75 : *Viner's Abr. Title Account, D. A. pl.* 7 : 3 *Atk.* 130 : 2 *Ves. Jr.* 581 : 2 *Freem. Ch.* 55 : 1 *P. Wms.* 354. The various acts of the complainant relied on to show an acquiescence in the defendant's title are at most equivocal, and are accounted for by ignorance of their rights and confidence in the defendant, who was their brother-in-law. *He* understood from the beginning the legal bearing and effect of all that was done, and it was his duty to put them in the way of ascertaining and asserting their rights. He cannot, under such circumstances, take advantage of their acts of ignorance.

*Black, Rodney, H. M. Ridgely* and *T. Clayton,* for the defendant.

There is no testimony to warrant the allegation of an *express* trust. The only evidence on this subject is that of George Monro, who does not pretend to state that he ever heard the defendant say, or insinuate, or give out, that he purchased for the widow and children. What they may have imagined or conjectured, or what may have been rumored, is not evidence. The trust must be established

by positive and legal proof. All the circumstances of the parties, render such a trust improbable, if not absurd. The estate of Nicholas Van Dyke was insolvent; the widow left with a family of small children and utterly without means to purchase the property. The defendant was at that time a young man, himself without fortune, and he sacrificed his own property and embarrassed himself to make the purchase. It cannot be imagined that he intended the lands as a gratuity to the family, and as little can it be supposed that they were expected to pay for them.

With respect to the alleged *implied* trust, there is no rule in England that a purchase by a trustee shall, under no circumstances, be valid. 1 *Ves. Jr.* 678. The extent of the rule is that the *cestui que trust* may come in, within a reasonable time, and have a re-sale. After a great length of time,—the party lying by—the court will not suffer the *cestui que trust* to come in and speculate, *Ibid* 682 ; or, if acts be done confirming the title, the Court will not interfere. *Ibid,* 680. In this case, the complainants have lain by. The defendant has been suffered to improve the estate, and lay out large sums of money upon it. By numerous acts they have recognized the defendant's title. To allow them now, after the lapse of nearly thirty years, to come forward and assert a title, would be a fraud on the defendant. 1 *Fonb, Eq.* 330–31 : 4 *Bro. Ch. Rep.* 258 ; *Newland on Cont.* 467.

Besides our denial of any trust, express or implied, there are several distinct defences to the whole case. One of these arises out of the fact that the lands in question were sold for the payment of Nicholas Van Dyke's debts, which still remain, to a large amount, unpaid ; and that his creditors would be the only persons interested, and the real *cestuis que trust*, were there any trust. But the creditors have from the beginning acquiesced in the sale, and are not parties to this suit. This alone is a fatal objection.

We further claim that the title of the defendant is con-

cluded by the action of the Orphans' Court. Although, in England, it is true, as a general rule, that he who undertakes to act for another in any matter, shall not in the same matter act for himself, the present case does not fall within the rule. In this State, lands are assets in the hands of the administrator for the payment of debts and may be sold by order of the Orphans' Court. If the administrator purchases at such sale it may perhaps be a good ground to set aside the sale; but if, upon the return of the sale, it is suffered to be confirmed without objection and without appeal, the confirmation is conclusive. The sale by an administrator may be likened to a sale by a Master in Chancery. Such a sale being at open auction, the master has been allowed to purchase. 1 *Cruise's Dig.* 551, *sec.* 36. An administrator or a master is not in the proper sense a trustee. The same *confidence* is as essential in trusts now as it was in uses at common law. 1 *Cruise's Dig.* 492, *sec.* 2. Trustees are chosen by the party, and have the estate from confidence; but an administrator is a mere officer of the law. A sale by the one is absolute, and no court has to pass upon it; in the other case, the Court has a controlling power and may confirm or reject it; and the action of the Court is conclusive.

Lastly, we insist upon the Act of Limitations. We do not set up the act as a positive bar, but claim that courts of equity will, by way of analogy, hold time to be a bar—that equitable rights will generally, by analogy, be affected by lapse of time in like manner as legal rights. 2 *Cruise's Dig.* 564, *secs.* 53, 54 : 1 *Ves. Jr.* 678 ; *Sugd. on Vend.* 242, 572 : 1 *Cox's Rep.* 149. The proposition that a trust is not within the Act of Limitations, applies only to cases between the *cestui que trust* and his trustee, *where there has been no adverse possession.* 2 *Cruise's Dig.* 565, *sec.* 55. In the present case there has been an adverse possession for nearly thirty years.

In the case of *Davy and wife vs. Patton's administrator,*

in Kent, the Chancellor refused to investigate an old account because it had been settled according to the prevailing notions of the times, although not according to the present acknowledged principles of law. Thirty years ago, it was believed that an administrator might purchase the real estate of his intestate by the intervention of a third person, and that in such case no trust resulted, either to the creditors or to the heirs at law. Many estates are now held under such purchases; and if, after this lapse of time, such titles are to be unsettled, and the holders decreed trustees, it will open a wide and fruitful field of litigation.

RIDGELY, CHANCELLOR.—Upon two grounds it is insisted that the defendant is a trustee for the complainants of the real estate held by him under the deed from George Monro, who was the purchaser at the sale made by the defendant as administrator of Nicholas Van Dyke, dec'd, viz : *first*, that there is an express trust; and, *second*, that a trust arises by implication of law.

*First.* As to the *express* trust. That, it is supposed, is made out by the testimony of George Monro. This witness, after describing the lands and stating the time and place of the sale and the attendance of other persons, says that he does not know whether those who attended the sale thought that the real estate was to be bought in for the widow and children, for that he mixed very little with the people ; that he knew his own object in attending the sale and had little or no communication with others. He went there at the request of the defendant and with the impression that he was to buy the real estate for the widow and children of Nicholas Van Dyke, and if he had not had such an impression he never would have attended the sale. He had a great regard for all the family and for the said Nicholas Van Dyke, and highly respected his memory. It was for this cause that he attended the sale and wished to

buy in the real estate, for the benefit of said Nicholas Van Dyke's widow and orphan children.

He further says, that he does not know whether the defendant represented that it was either his object, or wish, or intention, to secure the said real estate for the widow and children, nor does this witness know whether the said defendant made *any* representation or explanation. All that he (the witness) knows in this respect is, that he had an impression on his own mind that he was to buy in the real estate for the widow and children, so that the property might not be sacrificed, but be used to the best advantage for the benefit of the widow and children. The witness does not recollect the sum he bid for the said land, but states that he did not purchase for himself; that he purchased for the defendant, for the use and benefit of the widow and children, and that the defendant did request the witness to bid for him. The witness cannot remember the reasons which the defendant assigned for this request, nor whether he assigned any, but he considered, from the connection of the defendant with the family of Nicholas Van Dyke, and also from the confidence which the witness placed in his intentions, that the defendant wished him (the witness) to attend the sale for the purpose of buying in the property for the widow and children. From the assurances which the defendant gave the witness that he should incur no risk or difficulty, and that the said real estate should not remain on his hands, but that the defendant would take it off of his hands and secure him, the witness bid off the land, as he then thought, for the widow and children. He further says, that he never paid any consideration for the said real estate.

The sale of this real estate to George Monro was made on the 3rd October, 1789. The return was made the 6th October, 1789. Kensey Johns' deed to George Monro, is dated the 12th October, 1789, and George Monro's deed to Mr. Johns, the 13th October, the next day.

Opinion :—express trust.

In an administration account passed by Kensey Johns on the 6th April, 1790, he accounted for £1617, the amount of the sums bid by George Monro. It appears that the proceeds of the real estate fell far short of paying the debt of the decedent.

None of the other witnesses have any knowledge that the purchase was made for the benefit of the widow and children of Nicholas Van Dyke. Mr. Stockton rather contradicts that idea. Mr. Pearce had no communication with the defendant on the subject, but he understood among the people collected at the sale, that the property was purchased for the family and that on that account no person would bid.

This is the evidence upon which the express trust is supported. If this evidence is sufficient it will be manifest that this trust will grow out of the impressions of the witness and not from any express declarations of the defendant. George Monro attended the sale with the impression that he was to purchase for the benefit of the widow and children, and he repeats the convictions of his own mind more than once in the course of his testimony, but he declares that he does not know whether the defendant represented that it was his object, or wish, or intention to secure the land for the widow and children, nor does he know whether he, the defendant, made *any* representation or explanation. He does not remember whether Mr. Johns assigned any reasons for desiring him to attend the sale and purchase the land, but he considered from the connection of the defendant with the family of Nicholas Van Dyke and also from the confidence which the witness placed in his intentions, that Mr. Johns wished him to attend the sale for the purpose of buying in the property for the widow and children. In the whole of this transaction there is no evidence of any declaration of Mr. Johns. No terms, no conditions, no consideration, no limitation nor use of the land is talked of or agreed upon, by either Mr. Johns

or George Monro ; and yet it is expected that the impressions of the witness should be sufficient to amount to a declaration of trust. George Monro explains how it happened that these impressions were made on his mind. He considered, from the connection of Mr. Johns with the Van Dyke family and from the confidence which he placed in the intentions of Mr. Johns, that he was to purchase in the land for the widow and children.

Neither George Monro, nor the complainants, nor any one of Nicholas Van Dyke's family, ever paid any consideration for this land. The consideration or purchase money was accounted for by Mr. Johns in his administration account passed the 6th of April, 1790. Then, no valuable or meritorious consideration ever passed from George Monro or from any of the complainants : neither was any declaration made by parol or in writing at the time of the sale, nor when the deeds of conveyance were executed, nor at any other time, of any use of this land for the complainants.

An express use is where the use or interest is openly declared and expressed between the parties, upon the creation of the estate whereunto the use is annexed. *Sheppard's Touchstone,* 501. But, instead of any declaration or expression made between the parties of the use here claimed, we have merely the impressions of George Monro, without his knowing that Mr. Johns had any object, or wish, or intention to secure the land for the complainants, or even whether he made *any* representation or explanation in relation to this matter. To declare this to be an express trust for the complainants would be making the defendant a trustee upon the mere opinion or impression of George Monro, without any proof in relation to the defendant. The whole contract would be on one side, and the defendant's mind or intention would not be known.

Uses, it is said, may be created by word or parol agree-

ment, as well as by deed or writing; as if a man, by verbal agreement, in consideration of money or the like, sell his land to another, or agree and promise that the bargainee shall have it for any time, although no use or estate will thereby arise (if it be a freehold that is sold) within the statute, (27 *H.* 8 c. 16,) because it is not by deed indented; yet a good use will arise at common law, and the bargainee shall have relief in equity for his purchase. *Shep. Touch.* 508. But it is because the consideration, in equity, raises the use. 1 *Bac. Abr. Bargain and Sale,* C. 468.

Since the statute of 29 *Car.* 2 c. 3, all declarations of trust, except such as arise by implication of law, must be in writing, and signed by the party who is in law enabled to declare such trust, or else it must be by his last will in writing. If the English statute extends to this State, then there could be no express trust, because there is no such declaration in writing.

However, without determining that matter, I think that the complainants have failed in establishing any express trust, even by parol; for, whatever George Monro's intentions were, it was evident that he considered himself altogether as the agent of Mr. Johns in purchasing in or bidding off the land, and that he was to give no direction to the limitation or disposition of the land. He paid no consideration; he incurred no risk or difficulty; he was a mere instrument in passing the estate and conveying the legal title in the land. He made no terms; and, in short, it is evident from his testimony that no contract was ever made, or trust declared by, or between him and Mr. Johns for the use or benefit of the complainants.

*Second.* As to a trust *by legal implication.* In all cases of uses and trusts which are not within the statute of uses, (27 *H.* 8, *c.* 10,) the law is now as it was before the statute was made, and all those matters are determinable in chancery. 7 *Bac. Abr. Uses and Trusts,*135 ; *Shep. Touch.*

506.   In cases where uses pass by transmutation of pos-
session, as by fine, feoffment, or common recovery, then
the consideration is not material, for he who makes the
estate may appoint the use without any consideration.
But, in bargains and sales, and covenants to stand seized to
uses, it is otherwise ; for there the consideration is so nec-
essary that nothing will pass, neither will any use arise,
without a consideration, that is, some matter that may be
cause or occasion meritorious, amounting to mutual re-
compense, in deed or in law—which must be expressed
or implied in the deed whereby the use is created, or else
supplied by averment and proof.  7 *Bac. Abr. Uses and
Trusts*, 96, 97 : 1 *Bac. Abr. Bargain and Sale, D.* 469 : *Shep.
Touch.* 570: *Mildmay's  case*, 1 *Rep.* 175, *b*. 176. *a* : 3 *Bro.
Ch. Rep.* 12, 13.   And no court of conscience will enforce
*donum. gratuitum*.   In this  respect then, there can be no
implied trust ; for the complainants never  paid any con-
sideration.

But there is another rule in equity relied on by the
complainants ; that is,that a trustee cannot be a purchaser
of the estate of which he is a trustee, and that this is a
general rule of public policy depending, not upon the
circumstances of the case,but upon general principles; that
however honest the circumstances of any individual case
may be, the general interests of justice require the pur-
chase to be avoided in every case.   But, notwithstand-
ing the extent which is given to this rule in English deci-
sions, it is not there without some limitation.   In 1 *Ves.
Sr.* 9, *Whelpdale vs. Cookson*, Lord Hardwicke said that if a
majority of the creditors agreed to allow it (that is, a pur-
chase by a trustee made for him by another person,) he
should not be afraid to make the precedent ;· and in *Camp-
bell vs. Walker*, 5 *Vesey Jr.* 678, the Master of the Rolls,
afterwards Lord Alvanley, said that any trustee purchas-
ing trust property is liable to have the purchase set aside,
if, in any reasonable time, the *cestui que trust* chooses to say

he is not satisfied with it.    In that case it was referred to
the Master to inquire, whether it was for the benefit of
the plaintiffs that the premises should be re-sold.    Also,
in *Morse vs. Royal*, 12 *Ves. Jr.* 355, a purchase made by a
trustee was established under circumstances.    So that the
proposition is not universally true, that, at all times and
under all circumstances, a sale made by a trustee to him-
self is void ; and the broad rule, which now seems to pre-
vail in England, required years to bring it to its present
maturity.    See *Sugden on Vendors* 391, 394, 399.    It is not
even here desired that this sale should be declared void,
but that the defendant should be decreed to be a trustee
for the complainants of the land sold by order of the
Orphans' Court, and that an account should be taken of
the rents and profits.    According to the general course of
the cases in England, where the trustee remains in posses-
sion of the land which he has purchased of the *cestui que
trust*, and the sale is questioned and disapproved of by the
Court, the sale is declared void ; but where the trustee
has parted with the land at an advanced price, he is made
to account for the difference in value.    And when the sale
is declared void or the difference in price accounted for,
all who are interested in the estate, the *cestui que trust*, heirs,
creditors, those entitled to the surplus, if any—all come
in according to their respective interests.    Nothing can
be more equitable ; for if the act of the trustee is annulled,
all those in interest—no matter in what character or rela-
tion they stand to or are connected with the estate—all
should and ought to come in and be restored to their orig-
inal condition and relation to the estate, as near as time
and circumstances will allow.

   The prayer of this bill could never be allowed in its fullest
extent, under the most favorable circumstances, to the com-
plainants, because,if this sale should be declared void, then
the creditors of Nicholas Van Dyke must in the first place
be let in,for they have a superior equity to the complainants

and a better title in law to have that estate applied to their use, and the complainants could be entitled only to the surplus after the payment of the debts.    Upon no principle whatever can the heirs claim any advantage from this transaction in exclusion of the creditors.    If the sale was void, then the creditors present themselves as having in law a superior right, and if the sale has been so managed as to make the defendant a trustee, he is a trustee for the creditors as well as for the heirs, so that there can be no implied trust exclusively for these complainants.

But there are other reasons that should have weight in the consideration of this case.

*First,* is the long delay of the complainants.    The sale was made in the year 1789, now nearly thirty years ago. Abraham Van Dyke, the youngest child, was more than twelve years above the age of twenty-one when the bill was filed.    Sugden in his treatise *on Vendors,* 404, remarks, that if a *cestui que trust* acquiesce for a long time in an improper purchase by a trustee, equity will not assist him to set aside the sale.    He cites *Price vs. Byrn,* 5 *Ves. Jr.* 681, where Lord Alvanley refused the aid of the Court, because the bill had been delayed twenty-one years.    There was no period of time from the first purchase of this land to the present moment that it was not known that the defendant was the purchaser.    His deed to George Monro and George Monro's deed to him were quickly recorded.    The defendant held the land.    The widow during her life, and several of the complainants on their arriving at age, knew perfectly well the manner in which the title to this land was acquired, and there can be no pretence to say that this material fact was not as well known within one twelve month after the transaction as at any subsequent period.

*Second.* Another objection to the relief sought by this bill arises from the fact, that the sale was returned to and confirmed by the Orphans' Court.    But it is said the

Orphans' Court, is a court of limited jurisdiction, proceeding under the Act of Assembly, and 4 *Binney's Rep.* 404 ; 6 *Binney's Rep.* 490, are cited to show that a decree of the Orphans' Court may be examined in a collateral suit. It has been so decided in Pennsylvania, but I think not correctly, nor according to the general rules of law. Chief Justice Tilghman in 4 *Binney*, says, if the question were open ( that is, whether a decree of the Orphans' Court, should stand until it were reversed,) I should think it well worthy of consideration; but it has been otherwise settled in Pennsylvania, and in 6 *Binney*, he says, it might be more convenient and render the law more uniform, if those proceedings (in the Orphans' Court) were reversible only on an appeal ; but after the long practice, which has prevailed, of inquiring into these proceedings, in actions of ejectment, it is too late to attempt an alteration. It is evident that Chief Justice Tilghman is not altogether satisfied with the practice in Pennsylvania, and a slight consideration will show the inconvenience and frequent injustice of suffering those proceedings to be inquired into and reversed in every collateral suit.

The Orphans' Court does not exist by the Act of Assembly. A portion of the judicial power of the State is vested in the Orphans' Court, and with respect to the matters over which it has jurisdiction it is a court of as public and general jurisdiction as the Court of Chancery, the Supreme Court, or the Court of Common Pleas. It would be extraordinary that the judgment of a Justice of the Peace should be unimpeachable until reversed on a writ of *certiorari*, and that the decree of the Orphans' Court should stand for nothing or rather be liable to be impeached, reversed and annulled, before all and every tribunal in the State.

The Prerogative Court in England, is established for the trial of testamentary causes, where the deceased left *bona notabilia*, within two different dioceses. All causes relat-

ing to wills, administrations, &c., are originally cognizable before the judge of that court. An appeal lies to the King in chancery, by statute 25 *H.* 8 *c.* 19; 3 *Bl. Com.* 65. It is a court of public and general jurisdiction. 3 *Bl. Com.* 61, 71. Private or special courts are Forest Courts, commissioners of sewers, and others mentioned. 3 *Bl. Com.* 71, 72.

In all matters which fall within the jurisdiction of the Orphans' Court, it is a court of equity, and proceeds on the same principles as the Court of Chancery; and so it is in Pennsylvania, 2 *Binney's Rep.* 299 : *Cowper* 322, *Rex. vs. Grundon.* The temporal courts must consider the sentence of the ecclesiastical courts as final and conclusive, till reversed. In *Ambler*, 761, this doctrine was reviewed and confirmed.

Now, I can perceive no principle upon which proceedings of the Orphans' Court can be distinguished from those of the ecclesiastical courts in England, nor why its decrees should be examinable before every other tribunal in the State. If they may be examined here, or in the courts of law, so they may by any Justice of the Peace. In the case of *Robinson vs. Perkins*, in the High Court of Errors and Appeals, I understood that that court held itself bound by the decree made in the Orphans' Court, and made it the foundation of the account which was then taken between the parties. If the proceeding of the Orphans' Court may be examined in every collateral suit, the establishing of an appellate jurisdiction in the Supreme Court was worse than useless ; for it tends to mislead and deceive.

As the Orphans' Court had complete power to inquire into all the matters touching the administration of Nicholas Van Dyke's estate and the sale of the land, I am of opinion that the proceedings of that court should be conclusive on this, until they are reversed.

Bill dismissed.