way could find favor with any court. The straining of the machinery of the criminal law, whether to get convictions or for any other purpose, is a dangerous evil. Immediate results may be so obtained, but they do not stand the test of either just opinion or review upon appeal. As to the so-called examination of the marshal, obtained in the way I have stated, it is not sworn to at all.

Coming to the merits of the case, and the question of law involved, I am of opinion that the said statute abolishing the office of police justice is valid. Concededly, before the constitution of 1894 was adopted, the legislature had full power over the tenure of police justices in New York city. It was able to shorten it, or abolish the offices altogether. But it is claimed that section 22 of the judiciary article of the said constitution put the terms of office of the then existing police justices beyond the power of the legislature. It is as follows:

"Justices of the peace and other local judicial officers provided for in sections 17 and 18, in office when this article takes effect, shall hold their offices until the expiration of their respective terms."

Reference to the history and terminology of prior constitutions shows that this provision was adopted only out of caution, lest a question might arise whether the general effect of the revision might not be to oust such judicial officers from their offices. It grew out of that overcaution common in constitutional and statutory revision. It was not meant to take away the power of the legislature over the tenure of such police justices. That would produce the strange result of giving such immunity to the then incumbents only; and upon the expiration of their terms, those of their successors would again be at the pleasure of the legislature. I see no reason for such an interregnum of legislative power. I cannot find any intention in the constitutional convention to deal with such incumbents with such strange favor and tenderness. The reference to the terms of the said police justices by the words in the said section of the constitution, viz. "until the expiration of their respective terms," was to their terms as they then were, or as they might thereafter be abridged by the legislature.

The petitioner is discharged.

---

(15 Misc. Rep. 187.)

GENESEE & W. V. RY. CO. v. RETSOF MIN. CO.

(Supreme Court, Special Term, Monroe County. November, 1895.)

1. INJUNCTION—WHEN GRANTED—RESTRAINING INJURY TO PROPERTY.
    A court will enjoin pendente lite the destruction of property of which a lessor has repossessed himself by fraud and trickery from his lessee.

2. EVIDENCE—WRITTEN CONTRACT—INTENTION OF PARTIES.
    Where the language of a written contract is neither vague nor equivocal, parol evidence is inadmissible as to whether or not it was intended to modify a prior contract between the parties.

3. CORPORATIONS—MANAGEMENT—POWERS OF DIRECTORS.
    The business management of corporations is vested in their boards of directors, and contracts made by them, on which the interests of other parties depend, cannot afterwards be annulled by the stockholders.

4. SAME—CONTRACTS—PERSONAL INTEREST OF DIRECTORS.

In the absence of fraud or bad faith, a contract between two corporations is not rendered invalid by the fact that the directors of one hold an interest in the other.

Action by the Genesee & Wyoming Valley Railway Company against the Retsof Mining Company. Plaintiff moves for an injunction to restrain any interference by defendant with plaintiff's railroad pending the action. Granted.

The parties are corporations duly organized under the laws of this state; the plaintiff being engaged in the operation of a railroad originally constructed by the defendant, which is the owner of large and valuable salt mines and interests in the town of York, Livingston county, as well as of the fee of the land upon which a portion of the railroad was constructed. In June, 1891, the plaintiff became the assignee of a lease made by the defendant to William Foster, Jr., and Charles Q. Freeman, of the railroad above mentioned, and the equipment thereof, for the term of 999 years. This lease contained certain covenants and provisions of mutual benefit and obligation, one of which is the principal source from which flows the controversy between the parties. This provision reads as follows, viz.: "Third. The rates of freight to be charged by the lessees, or their assigns, of said railway company from Retsof, shall at no time be more than one cent per barrel (or per 300 lbs. of merchandise in not less than car-load lots) in excess of the rates from time to time in effect from the existing junction points of said road on the Delaware, Lackawanna and Western Railroad and Western New York and Pennsylvania Railroad, and such additional tariff shall be charged only on such shipments as are not covered by contracts between the Genesee and Wyoming Valley Railway and connecting railroads." And it is followed by another, which permits the defendant, in the event of the failure of the lessee to observe any and all of the covenants of said lease, "to enter upon and take possession of and use and dispose of and for its own exclusive right all and singular the premises, property, and rights hereby demised, and all contracts, fixtures, improvements, and permanent property and appurtenant rolling stock which may be hereafter constructed on or added to the demised premises, or any part thereof; and to exclude the lessees and all other persons wholly therefrom." Subsequently, and upon the 25th of October, 1894, the parties hereto entered into a supplemental agreement in writing, by the terms of which the defendant agreed to ship all the "salt and products of manufacture produced by it at the works at Retsof," and to receive "all merchandise and material of every description which shall be coming to it," upon the plaintiff's railroad, in consideration of which the plaintiff agreed that it would "transport the same at not exceeding the rates that are charged and received by other railroad companies for similar transportation and service." After this agreement had been entered into, the plaintiff undertook to transport the products of the defendant's mines to the various connecting lines of railroad, and in doing so charged therefor a rate which was in excess of one cent per barrel, but which was not greater than the rates charged by other railroads, and by this very road while it was owned by the same parties who compose the defendant's corporation, for similar service. The defendant's officers, claiming that the plaintiff had violated its contract, undertook to avail themselves of the re-entry clause of the lease. But, instead of resorting to the usual legal remedy, they waited until all the plaintiff's employés save a solitary watchman had returned to their homes upon the night of October 30, 1895, and then sending for the watchman to come to the defendant's office upon the pretext that they desired to make him a present, delivered to him a written notification of the alleged violation of the third clause of the lease, and of their intention to enforce the penalty therefor; and while this interview was in progress a gang of men, numbering more than 100, armed with clubs, and some of them with guns, took possession of the plaintiff's railroad and rolling stock, and proceeded to tear up the tracks, and destroy or render useless all the property upon the premises. In order to make certain that the work of destruction should be completed, cans of dynamite were

subsequently placed at convenient points along the bank and in the abutments of the railroad bridge, a few rods from the head house, and these were connected with electric wires, so that they could be exploded upon a moment's notice in the event of any attempted interference upon the part of the plaintiff. Fortunately, at this juncture the court intervened with a preliminary injunction, and the parties responsible for the condition of affairs above described were considerate enough to forbear the further assertion of their rights in the manner at first attempted until this motion could be heard and decided.

Saterlee, Yeoman & Taylor, for plaintiff.
Charles J. Bissell and William B. Putney, for defendant.

ADAMS, J. This motion involves the question of whether or not one corporation, for some real or fancied wrong received at the hands of another rival or obnoxious corporation, may take the law into its own hands, declare war, and proceed to destroy property and imperil human life. Incidentally, to be sure, some questions of construction are to be considered, the decision of which, in ordinary circumstances, would be controlling upon the rights of the parties. These will, of course, receive proper attention; but, after all, the important and overshadowing subject of inquiry is the one first adverted to. It is difficult to contemplate the condition of affairs which the undisputed facts of this case present with judicial calmness, or to characterize conduct such as some of the officers of the defendant have been confessedly guilty of, without indulging in language more or less fervid. Not only have they resorted to force and violence, and thereby occasioned a disturbance of the public peace in the attempted assertion of what they have determined to be their legal rights, but they have wantonly destroyed property of great value, and have not hesitated to proclaim their entire willingness to incur even more serious consequences if their work of destruction was interfered with. Now, I am not unmindful of the rule of law which enables a landlord who has obtained peaceable possession of premises under the re-entry clause of a lease, where there has been a breach of covenant, to maintain the possession therein obtained as against the lessee and the whole world. Cain v. Flood (Com. Pl.) 14 N. Y. Supp. 776; Alexander v. Griswold (Com. Pl.) 17 N. Y. Supp. 522; Wood v. Phillips, 43 N. Y. 152; Bliss v. Johnson, 73 N. Y. 529. Nor do I overlook the language of the lease in question, which provides that the defendant, in the event of a breach thereof, may not only enter upon and possess itself of the demised property, but may also "use and dispose of it for its own exclusive right"; and, had the lessor in this case contented itself with resorting to nothing worse than trickery to obtain possession, and, having thus obtained it, maintained its possessory privileges in a quiet and orderly manner, no other question could have arisen than the rights secured to the respective parties by the original lease and in the supplemental contract. Wood v. Phillips, supra. But that is not this case. Not only was fraud employed to compass possession, but, as soon as it was obtained, force was resorted to, in order that it might be maintained, and, instead of resting satisfied with securing the possession of the demised property, its

utter destruction was attempted, which, had it been accomplished, would have worked great and irreparable injury to the plaintiff, and would likewise have rendered wholly worthless the security upon which $500,000 worth of bonds had been issued with the knowledge and consent of the defendant.

For the reasons stated, and because fortunately there has never, so far as I am aware, been any necessity for applying the law to this precise state of facts, none of the authorities which have been or can be cited exactly fit the case; but it is not conceivable that in this enlightened period of the world's history a party can obtain possession of property in the manner in which this defendant's officers and agents admit they have,—that is, by fraud and trickery,—and then work all manner of destruction and injury in a disorderly and tumultuous manner without rendering themselves amenable to the injunctive process of a court of equity.   At all events, this court is willing to become responsible for a precedent which must be respected at least until it is reversed by some higher authority.   A criminal proceeding might, it is true, punish the wrongdoers, but I fail to see wherein it would afford any adequate protection to the plaintiff for the destruction of its property in the event that it shall be ultimately determined by the courts that it has any property to protect.   Before leaving this branch of the case, however, it is but simple justice to the counsel for the defendant to say that they have disclaimed all responsibility for the indefensible conduct of their client, although, in view of their well-earned reputation as gentlemen of practical common sense, as well as lawyers of conceded ability, such a disclaimer is quite superfluous.

If correct in the views already expressed, it would seem that the plaintiff's motion might be disposed of without considering the questions to which counsel addressed their principal argument upon the hearing.   Nevertheless it is desirable, perhaps, that the court should indicate as briefly as possible the conclusion it has reached respecting the main issue, and its reasons therefor; and especially is this so in view of the fact that the learned counsel for the plaintiff did not appear to attach to the question already considered the importance of its relation to this particular proceeding which the court accords it.   It will, of course, be necessary, in order to determine the relative rights of the parties, to give proper effect and construction to the agreement of October 25, 1894, for upon the part of the plaintiff it is claimed that this instrument, by its terms, very materially modifies the third clause of the original lease, while, upon the other hand, the defendant insists that no such effect can be given it, and that it would not aid the plaintiff if such a construction were possible. In approaching the consideration of this vital question it is important, I think, to bear in mind that the construction for which the defendant is contending involves the forfeiture upon the part of the plaintiff of property and interests of very great value, and, this being the case, it is bound to establish its claim in the most satisfactory manner by reason of the well-established rule that the law does not regard forfeitures with much favor.   Baley v. Insurance Co., 80 N. Y. 21.   The agreement of October 25th does not, it is true, in express

terms either supplant or supplement the conditions of the original lease. It does not even refer to the last-mentioned instrument. But it does contain all the essentials of a complete and independent contract, and one which is apparently mutual in its character, and which likewise bears upon its face evidence of mutual consideration. By its terms the plaintiff agrees to transport the defendant's salt at the same rates which other transportation companies receive for similar service, and the defendant agrees to pay such rates for the term of 10 years. In order to break the force of this new contract, affidavits are produced upon the part of the defendant tending to show that it was not designed by either party that it should in any way alter or modify the terms of the original agreement, save in the one particular; that it should relieve the defendant from the payment of any freight whatever upon the salt taken from its mines to the connecting lines of railroad. However this may be, there is nothing vague or equivocal in its language, which, as has been shown, does establish new rates; and its effects can hardly be limited by any verbal understanding dehors the contract itself. At least, such an issue as that cannot very well be tried upon affidavits. But it is further argued this contract is of no force, even if entitled to receive the construction which the plaintiff has been pleased to put upon it, for the reason that it was executed by the directors of the defendant, who were, at the time of its execution, also interested in the plaintiff corporation; and for the further reason that it was subsequently revoked by a resolution of the defendant's stockholders. The answers to these propositions, it seems to me, are quite obvious. In the first place, the management of the business of a corporation is always confided to the board of directors. It is true that they possess no authority, independent of the stockholders, to make any material and permanent alteration of the business or constitution of the body they represent (Mor. Priv. Corp. § 12), but in the ordinary every-day business affairs of the corporation their action is all that is necessary, and, when such action is once taken, and the interests of a third party intervene, it would be singular if those interests could be impaired by any action of the stockholders. If such a rule should once obtain, it would seriously derange the business interests of the country; for, to illustrate, the directors of a railroad company might contract with a manufacturer for 10,000 tons of steel rails, and just before their delivery the stockholders could get together, and revoke the contract, and the manufacturer would be remediless. Now, the contract of October 25th pertains to the ordinary business relations of the two corporations, viz. the transportation of freight and the rates therefor. It would seem, therefore, that if the board of directors was clothed with any independent authority whatever it must have related to just such matters as these. The objection that the directors of the defendant were also interested in the railroad company at the time this supplemental contract was entered into is not, in the absence of fraud or bad faith, I apprehend, entitled to much weight, and it is not intimated that either of the parties to this instrument was guilty of bad faith. On the contrary, it was executed because it was supposed it would prove beneficial to both.

It was said in the case of Wallace v. Railroad Co., 12 Hun, 460, that the facts that the same persons were directors of the leasing and leased railroad might of itself entitle either corporation to avoid its contract, but that it was insufficient to avoid it at the instance of one or more stockholders. This, however, seems to be the mere expression of an opinion, and does not harmonize with the language which precedes it, wherein it is stated that all acts of the directors of a corporation, within their corporate powers, and "done in good faith, are valid and binding, not only upon the corporation, but on each stockholder thereof." The rule contended for by the learned counsel for the defendant has been considerably relaxed of late years. Indeed, it would be difficult to conduct the affairs of the multifarious corporations of the country, many of which, although apparently sustaining the relations of rivals in business, are nevertheless practically controlled by the same directors, if the element of good faith, instead of individual interests, were not established as the basis of intercorporate action. Van Cott v. Van Brunt, 82 N. Y. 535; Gamble v. Water Co., 123 N. Y. 91, 25 N. E. 201; Oil Co. v. Marbury, 91 U. S. 587.

The court has been reminded that the injury complained of is at most a trespass, and that its injunctive power should not be exerted to redress a wrong of that character. If this were the case of an ordinary trespass, in which the injury could be compensated for in dollars and cents, it would have been unnecessary to have urged any other objection to the granting of this motion than the one mentioned. But it is not. The injury already done, and that which may be accomplished by a continuance of the trespass, are so serious as to be incapable of measurement by any pecuniary standard, and the case seems a proper one for the interference of the court in the manner asked for, even though it may perchance entertain some doubt as to the final result of the controversy. Injunctions do, it is true, to some extent at least, anticipate the ultimate judgment of the court, and for that reason, if for no other, they should be granted cautiously, and perhaps even reluctantly; but the right to grant them nevertheless resides in the discretion of the court, and this power should be exerted whenever the protection of such vast interests as are at stake in this action seems to require it. People v. McKane, 78 Hun, 155, 28 N. Y. Supp. 981.

The motion should therefore be granted, with $10 costs.