FREDERICK A. EBERHARDT. WILLIAM H. MYERS, JOSEPH H. DAWSON, JAMES A. EBERHARDT, BENJAMIN F. SHEPPARD, JOHN S. MURPHIN and ALEXANDER P. BYRNE,

*vs.*

THE CHRISTIANA WINDOW GLASS COMPANY, JOHN L. BYRNE, PATRICK J. BYRNE, MICHAEL J. BYRNE, BYRNE GLASS COMPANY, ARTISANS' SAVINGS BANK, MARY E. BYRNE, EDWARD J. BYRNE, EDWARD H. BYRNE, JOHN E. FOX, BENNETT, BROWN AND BENNETT, INCORPORATED, and WILLIAM S. PRICKETT.

*New Castle, Nov. 23, 1911.*

A trustee cannot purchase trust property, either directly or indirectly, whether there be one or more trustees, unless the beneficiary assent to or ratify the sale, or be guilty of laches.

The prohibition is rigidly applied as a preventive of fraud, and is enforced though the purchase be *bona fide* and for full value.

While the trustee remains the owner of the trust property so purchased, the deed will be declared void; and if he shall have parted with it at an advanced price, he is made to account for the difference in value so gained.

Where directors of a corporation by special agreement with the stockholders are constituted trustees to wind up the affairs of the corporation, they have, in addition to the usual limitations upon dealings of directors respecting corporate property, the limitations imposed on trustees and cannot purchase the property of the corporation without the knowledge of the stockholders.

One of three directors, who were trustees to wind up the affairs of a corporation, obtained from the co-trustees an option to purchase the property of the company to enable him to form a new corporation to acquire it, and organized such new corporation, in which he, his wife and son were the only stockholders. The consideration for the conveyance to the new corporation was the assumption of the debts of the old company, and these debts are paid after a re-sale of the property by the new

corporation at an advance and from the proceeds of that sale *Held*, there was a breach of trust and there being no equity in favor of the new corporation or its stockholders the new corporation will be declared to hold a purchase money mortgage given to it by its vendee for the benefit of the stockholders of the original company.

Bill by Stockholders Against Liquidating Directors for an account. The facts sufficiently appear in the opinion.

*John P. Nields* and *Christopher L. Ward*, for the complainants, claimed that the facts showed:—

1. That between J. L. Byrne and P. J. Byrne on the one hand, and the other stockholders on the other hand, a fiduciary relation existed, the said Byrnes being trustees for liquidation and sale of the corporation's property for the benefit of all.

2. That a sale of the real estate was made by them to John L. Byrne, and by John L. Byrne to a corporation composed of himself, his wife and son, and by that corporation to Bennett, Brown and Bennett, Inc., with a resultant large profit which must be accounted for to the stockholders of The Christiana Window Glass Company.

An agent or trustee for sale cannot, directly or indirectly, become the purchaser of the property which has been confided to him for sale. Directors of corporations, and all persons who stand in a fiduciary relation to others and are clothed with power of sale, come within this rule. If such agent or trustee purchase, his principal or beneficiaries may either disaffirm the sale and recover the money, or affirm the sale and hold him to his purchase. If, having so purchased, he sell again at a profit, his principals or beneficiaries may have an accounting of the profits. The rule holds good irrespective of the adequacy or inadequacy of the consideration paid by the trustee, evidence as to which is irrelevant. The right to disaffirm and to have an accounting of profits is independent of all considerations of adequacy of price. It is at the option of the principal or beneficiary, and is enforced as a matter of course. Purchase by the wife of the trustee or selling agent, or by a corporation formed by him for the purpose, or in which he is

largely interested, or by the agent himself or his wife, is within the rule. The rule is "absolute and universal." It is subject "to no qualifications and to no exceptions." It is founded on rules of public policy and it is enforced with "unrelenting rigor."

The solicitors for the complainants also contended, that where the power of liquidation and sale of the entire corporate property has been conferred by the stockholders on two or more directors upon their undertaking to sell the corporate property and to account to the stockholders for the surplus, those directors are trustees for sale and subject to the above rule of equity; that the sale of the corporate property by such directors to a corporation organized by one of the directors, with his wife and son, for the purpose of buying the corporate property, is voidable at the election of the stockholders; and *a fortiori*, such a sale to such a corporation is voidable where, (a) no genuine consideration is paid; (b) the sale is secret and concealed from the stockholders; and (c) the pretended consideration in the opinion of credible expert witnesses is not half the value of the property at the time of the sale. *Fox v. Mackreth*, 2 *Bro. C. C.* 400 (1 *White & Tudor's Leading Cases in Equity, pt.* 1 *115); Davoue v. Fanning*, 2 *John. Ch.* 252; *Michoud v. Girod*, 4 *How.* (*U. S.*) 503; *Keech v. Sandford, Cas. Temp. King* 61; *Whelpdale v. Cookson*, 1 *Ves. Sr.* 9; *Whichcote v. Lawrence*, 3 *Ves. Jr.* 740; *Ex parte Lacey*, 6 *Ves. Jr.* 625; *Ex parte James*, 8 *Ves. Jr.* 337; *Randall v. Errington*, 10 *Ves. Jr.* 423; *Ex parte Bennett*, 10 *Ves. Jr.* 381; *In re Bloye's Trust*, 1 *Mac. & G.* 488; *Martinson v. Clowes, L. R.* 21 *Ch. Div.* 857; *Church v. Marine Ins. Co.*, 1 *Mason* 341 (*Fed. Cas.* 2711); *Wormley v. Wormley*, 8 *Wheat.* 421; *Wardell v. Railroad Co.*, 103 *U. S.* 651, 658; *Robertson v. Chapman*, 152 *U. S.* 673; *In re Frazin & Oppenheim*, 181 *Fed.* 307; *Moore v. Moore*, 5 *N. Y.* 256; *Hawley v. Cramer*, 4 *Cowen* 717; *Gallatian v. Cunningham*, 8 *Cow.* 361; *De Canters v. De Chaumont*, 3 *Paige* 178; *Van Epps v. Van Epps*, 9 *Paige* 237; *Campbell v. Johnston*, 1 *Sand. Ch.* 148; *Conger v. Ring*, 11 *Barb.* 356; *Jewett v. Miller*, 10 *N. Y.* 402; *Gardner v. Ogden*, 22 *N. Y.* 327; *Carson v. Marshall*, 37 *N. J. Eq.* 213; *Deegan v. Capner*, 44 *N. J. Eq.* 339 (15 *Atl.* 819); *Freeman v.*

*Harwood*, 49 *Me.* 195; *Pratt v. Thornton*, 28 *Me.* 355; *Page v. Naglee*, 6 *Cal.* 241; *Burke's Adm'r. v. Bours*, 92 *Cal.* 108; *Dwight v. Blackmar*, 2 *Mich.* 330 (57 *Am. Dec.* 130); *Sheldon v. Rice*, 30 *Mich.* 296 (18 *Am. Rep.* 139); *Faucett v. Faucett*, 64 *Ky.* 511; *Dorsey v. Dorsey*, 3 *Har. & J.* 315 (6 *Am. Dec.* 506); *Thorp v. McCullum*, 6 *Ill.* 614; *Scott v. Freeland*, 7 *Smedes & M.* 409 ( 24 *Am. Dec.* 310).

The same rule applies in case of a sale to another and reconveyance to the trustee. *Downes v. Grazebrook*, 3 *Mer.* 200; *Price v. Morris*, 5 *McLean* 4 (*Fed. Cas.* 11414); *Johnson v. Bennett*, 39 *Barb.* 237; *Obert v. Hammel*, 18 *N. J. L.* 73; *Blauvelt v. Ackerman*, 20 *N. J. Eq.* 141; *Romaine v. Hendrickson's Exr's.*, 27 *N. J. Eq.* 162; *Rosenberger's Appeal*, 26 *Pa. St.* 67; *Shuman's Appeal*, 27 *Pa. St.* 64; *Davis v. Simpson*, 5 *Harr. & J.* 114; *Richardson v. Jones*, 3 *Gill & J.* 104; *Boynton v. Brastow*, 53 *Me.* 362; *Litchfield v. Cudworth*, 15 *Pick.* 23; *Dyer v. Shurtleff*, 112 *Mass.* 165; *Hunt v. Bass*, 2 *Dev. Eq.* 292; *Saltmarsh v. Beene*, 4 *Porter* (*Ala.*) 283; *Armstrong v. Campbell*, 11 *Tenn.* 201; *McClanahan v Chambers*, 17 *Ky.* 43; *Gibson v. Herriot*, 55 *Ark.* 85 *Sypher v. McHenry,* 18 *Ia.* 232; *Gilbert v. Hewetson*, 79 *Minn.* 326 (82 *N. W.* 655); *O'Connor v. Flynn*, 57 *Cal.* 293; *Walker v. Walker*, 101 *Mass.* 169. Also to a sale by trustees or directors of a corporation to themselves. *Wing v. Hartupee*, 122 *Fed.* 897; *Cleeland v. La Crosse & M. R. Co.*, *Fed. Cas.* 2887. Also to a sale by the trustee to wife or husband. *Scott v. Gamble and wife*, 9 *N. J. Eq.* 218; *Bassett v. Shoemaker*, 46 *N. J. Eq.* 538 (20 *Atl.* 52); *Dundas' Appeal*, 64 *Pa. St.* 325; *Tyler v. Sanborn*, 128 *Ill.* 136. Also to a sale to a corporation in which the trustee is interested. *Abbott v. Am. Hard. Rubber Co.*, 33 *Barb.* 578; *Hoyle v. Plattsburg, etc., R. R. Co.*, 54 *N. Y.* 314; *Hoffman, etc., v. Cumberland, etc., Co.*, 16 *Md.* 456; *s. c.* 20 *Md.* 117; *Robbins v. Butler*, 24 *Ill.* 387; *Bowes v. Toronto*, 11 *Moore P. C.* 463.

*L. Irving Handy*, for the defendants, Byrne Glass Company and John L. Byrne, claims that there was no trust between the corporation and the retiring stockholders, nor between such retiring stockholders and Patrick J. Byrne and John L. Byrne.

Assuming for the sake of the argument, that the complainants assigned their stock to The Christiana Window Glass Company with the understanding that they were to be paid for it whatever the stock might be found to be worth, first deducting from each stockholder's share his personal indebtedness to the corporation, and that the complainants are therefore to be considered and treated in equity as stockholders; the defendants claim that the testimony shows that John L. Byrne, Patrick J. Byrne and Michael J. Byrne, as directors of the corporation, performed their full duty with fidelity, disposed of the assets of the corporation to the best possible advantage, and paid the debts of the corporation with the proceeds so far as the money realized would go; and that nothing is due to the complainants because there was no surplus, not quite enough money having been realized to pay all of the corporation's debts.

A director may purchase from the corporation under a rule which casts upon the director the burden of sustaining the transaction, by showing that it was proper, fair, made in good faith and for an adequate consideration. *Hancock v. Holbbrook, et al.*, 3 *So. Rep.* 351; 3 *Thomp. on Corp.* § 4059; *Skinner v. Smith, et al.*, 134 *N. Y.* 240; *Pneumatic Gas Co. v. Be ry, et al.*, 113 *U. S.* 322; *Ryan v. Williams*, 100 *Fed.* 172; *Union Trust Co. of Md. v. Carter*, 139 *Fed.* 717; *Wyman v. Bowman*, 127 *Fed.* 257; *Barr v. Pittsburg Plate Glass Co.*, 57 *Fed.* 86; *Strobel v. Brownell*, 40 *N. Y. Supp.* 702; *Ashurst's Appeal*, 60 *Pa. St.* 290.

A contract between two corporations is not rendered void by the fact that some of the persons making the contract were officers of both corporations and represented both corporations to the extent of their respective powers. 3 *Thomp. on Corp.*, §§ 4079, 4080; *Rolling Stock Co. v. R. R. Co.*, 34 *O. St.* 450; *Booth, et al., v. Robinson, et al.*, 55 *Md.* 419; *Langan v. Francklyn*, 20 *N. Y. Supp.* 404; *Leavenworth v. Chicago, etc., R. R. Co.*, 134 *U. S.* 688; *Pauly v. Pauly*, 107 *Cal.* 8; *Griffin v. Inman, etc., Co.*, 57 *Ga.* 370; *Public Ha'l Co. v. Bank of Commerce*, 144 *Ind.* 34 (42 *N. E.* 1097); *Library Hall Co. v. Pittsburg Asso.*, 173 *Pa. St.* 30; *Shaw v. Davis*, 78 *Md.* 308; *Manufacturers'*

*Sav. Bank v. O'Reilly, et al.*, 97 *Mo.* 38; *Genesee, etc., Co. v. Retsof Mining Co.*, 36 *N. Y. Supp.* 896; *Burden v. Burden*, 159 *N. Y.* 287 ( 54 *N. E.* 17).

In conclusion, the trend of modern decisions in this country is against the contention of the complainants' solicitors, that the rule against a trustee buying trust property applies in all of its rigor to a director of a corporation buying the property of the corporation. No advantage can be gained from consulting modern English decisions on the point, because they are all based on a British statute passed under Victoria. The trend and weight of modern American decisions is that no constructive fraud vitiates or taints the sale of the real estate of The Christiana Window Glass Company to the Byrne Glass Company. If there is any fraud in that sale at all, it must be actual fraud—fraud in fact. The evidence does not show any fraud in fact, but does show perfect good faith and honest intent of the part of all concerned; and, therefore, whether the complainants parted with all of their interest in The Christiana Window Glass Company on January 14th, 1908, as the defendants claim, or continued to be equitable stockholders in that Company, as the complainants claim, in either event, the bill should be dismissed.

*John P. Nields* and *Christopher L. Ward*, for the complainants, in reply: The *cestui que trust* is the corporation. The trustees, or agents, are the directors. A sale to one of the directors can be made only if the corporation consents. The consent of the corporation can be had only by consent of a majority of the stockholders—in this case only by consent of a majority of stockholders, legal and equitable. A corporation may disaffirm and avoid the sale, or require an accounting of profits just as an individual *cestui que trust* can, unless it has first consented to the sale, subsequently ratified it, or been guilty of laches. In every case cited by the defendants, to show that directors of a corporation may sell to themselves, or make contracts with the corporation, or with other corporations in which they are interested, it will be found that the corporation which is seeking to avoid the contract had first consented

by a vote of its stockholders, or subsequently ratified it, or had been guilty of laches. If, therefore, the defendants in this case can show the purchase of property by a director from the corporation under the same rules that would apply governing the purchase by a trustee from a *cestui que trust*, they can maintain their position, and not otherwise. The requirements are that the *cestui que trust* must have consented, or subsequently ratified, or been guilty of laches. In this case the directors had not merely the powers of ordinary directors. They had assumed a definite relation of trust and confidence.

The solicitors for the other defendants did not participate in the argument.

THE CHANCELLOR: The seven complainants were formerly stockholders of The Christiana Window Glass Company, and assert that though nominally they had assigned their shares to the company, they were still equitably entitled to the rights of stockholders to participate in a distribution of the assets of the company in liquidation. In 1886 the company was formed by seventeen practical glass-workers, including the complainants, each having subscribed and paid for an equal amount of the capital stock and until 1908 the company carried on the business of making and selling window glass, in effect on the co-operative plan, practically all the stockholders being engaged in making or selling glass. From time to time, in addition to regular wages, sums were paid to the several stockholders as advances, at irregular times and in different amounts, without undertaking to equalize them among the stockholders. These amounts were charged against the individual stockholders. For several years the enterprise prospered. The company first, leased, and then bought for $25,000, a plant, and paid for and improved it, until they had so expended about $37,000 from earnings. Some of the original stockholders dropped out, until only thirteen of them remained in 1908. For several years before 1908 the company had been losing money, owing to a change in the cost of production of glass elsewhere. Finally, being without money to buy supplies, the end was reached on January 10th, 1908, when the plant was shut down and opera-

tions were never resumed there. This threw out of employment the stockholders, who were still carrying on the business on the co-operative plan, but who were evidently surprised by the sudden termination of the activities of the company and financially unprepared therefor. At this time Patrick J. Byrne was president and general manager, John L. Byrne secretary, and there were five directors; but none of them received salaries beyond their wages, like the other stockholders, employees in the several employments in the common business.

At the cessation of business the assets of the company consisted of the glass factory and about five acres of land in the City of Wilmington, which at a conservative estimate was then worth about $10,000, manufactured stock valued at about $6,000, and bills receivable of face value of about $2,500, aggregating, according to John L. Byrne's estimate, $18,500. The debts consisted of a note of $4,100, made by the company to Central National Bank of Wilmington, endorsed by Michael J. Byrne, and a bond made by the company to Michael J. Byrne for $4,000, the aggregate being $8,100. At this time the amounts charged against the several stockholders varied in amounts from $54.38, charged against William H. Myers, to $2,679.92, charged against John L. Byrne, $2,974.11 against Patrick J. Byrne, $3,009.92 against E. H. Byrne, and $4,772.42 against A. P. Byrne; but none of these sums were collectible, the debtors being without property available, so that these debts due the company were not of consequence as assets to be realized on.

It being clear that a further continuance of the business was unwise, and that liquidation was inevitable, the advice of counsel was sought as to the best methods of winding up the company. A receivership was advised, and Patrick J. Byrne and John L. Byrne also considered together the plan of having the affairs of the corporation put in their hands to be settled. On Saturday, January 11th, 1908, a meeting of the stockholders was held, at which all were present except Michael J. Byrne and Edward H. Byrne, and another meeting was held on Tuesday, January 14th, 1908. There is so much dispute as to what in fact took place at these meetings that it is diffi-

cult to reconcile all the evidence, including the testimony of witnesses as to what took place, the minutes of the meetings and the formal agreements and written instruments actually signed. It is conceded on all sides that at the meeting on January 11th the plan of constituting Patrick J. Byrne and John L. Byrne as trustees in liquidation was discussed, and that no conclusion was reached, but legal advice was to be taken as to it. It was understood by all present, however, though the minutes do not disclose that any such action was taken, that the stockholders, who had been thus suddenly thrown out of employment, should each receive $100 from the company to tide over their personal financial needs; and that Patrick J. Byrne and John L. Byrne were each to receive $25 per week for services as liquidators. John F. Malloy and John W. Brady, the legal counsel of the company, decided that, under the provisions of the charter of the company, the suggested plan for all the stockholders to turn over their shares of stock to Patrick J. Byrne and John L. Byrne to act as trustees could not be used. By the charter, no stockholder could hold or own more than twenty shares, nor less than ten shares of stock, and this was considered a bar to the method. There is another provision of the charter which provided that in case a stockholder desired to withdraw his shares, the company had the right to buy them at a valuation of the stock to be made by two appraisers, one appointed by the company and one by the withdrawing stockholder. (See section 8, par. "b", of the charter.)

Mr. Brady was present at the meeting held on January 14th, 1908, at which all the stockholders were present, except Michael J. Byrne, who, by the way, does not seem to have participated in the preliminary arrangements. Preparations had been made by Mr. Brady of a plan, and the papers and proceedings necessary to carry them into effect had been prepared in advance by him, including the minutes of the proposed meeting. He explained to those present that it was unadvisable to liquidate by a receivership, and gave reasons; and stated the difficulties preventing the transfer of all the shares to two of the stockholders to liquidate; but that "they

could get around the difficulty by paragraph 'b' of section 8"
of the charter; that is having the shares of the withdrawing
stockholders assigned to the company, the assignors to receive
from the company $100, as agreed upon at the prior meeting.
So far there does not seem to be much dispute about the facts.
It is also undisputed that at this meeting on January 14th,
1908, certain things were done:

(1) All the stockholders indebted to the company (and
they were all so indebted, except Michael J. Byrne) signed a
paper, in the form of an agreement with the company, signed
for the company by Patrick J. Byrne, as president, and F. A.
Eberhardt, as secretary, of The Christiana Window Glass Com-
pany, reciting the indebtedness of the individual stockholders
to the company, by reason of the amounts withdrawn by them,
and stating the several amounts, and agreeing further as
follows:

"That in the event of the sale of the property, real and per-
sonal, of the said party of the first part, each of the parties of
the said party of the second part shall have deducted from
his share of the proceeds of such sale, the amount of money in
which he is indebted to the said party of the first part."

This agreement was read to and fully understood by all
present.

(2) Each stockholder signed a form for assignment of his
shares on the back of the certificate, the name of the assignee
being then blank, and the certificates were left with the com-
pany.

(3) The number of directors was reduced from five to three.
Three directors resigned, whereby Patrick J. Byrne and John
L. Byrne were left as the only surviving directors, and Michael
J. Byrne was then elected to be the third director.

It is claimed by the complainants that it was the clear
understanding of all present, that this was a method adopted
to constitute the three directors liquidators, whose duty it
was to collect the assets, including a sale of the plant, pay all
the debts and divide the balance among all the stockholders
equally, including all those who had technically withdrawn as
stockholders, each one being charged with the amounts due

from him to the company, and the two directors, Patrick J. Byrne and John L. Byrne, to be paid a salary for their services as liquidators; that they had not really withdrawn as stockholders; that they never appointed an appraiser to value the stock for them; that they could hold the liquidating directors to the responsibility of trustees, and obtain an accounting of their dealing with the trust property. On the other hand it is claimed that the withdrawals of the complainants as stockholders were actual and real, the company having become the purchaser and assignee of their shares made under. the charter for $100 after due appraisement thereof; and that they thereby definitely and finally disposed of all their legal and equitable rights as stockholders, and had no right to an accounting from the liquidating directors.

It is clear beyond doubt that the contentions of the complainants are proven by the testimony. By the testimony of the complainants, by that of Mr. Brady and of John L. Byrne, the plan of a trusteeship having been declared impracticable, the method actually adopted was substituted, in order to accomplish the same purpose, viz., constitute the three directors liquidators; and that after liquidation the stockholders, meaning all the thirteen persons, including the complainants, who held shares of stock at the cessation of business, should share the surplus, if any there was for distribution, notwithstanding the apparent termination of their interests and rights as stockholders by the assignment of their stock. The only witness most interested to deny this, not only does not do so, but practically admits it to be true. In his testimony, John L. Byrne, testified as follows:

"Q. You had told these withdrawing stockholders that so far as you could bring it about, that after the debts of The Christiana Window Glass Company had been paid and its affairs settled, if there was any surplus left you would see that it was divided among the stockholders least overdrawn?

"A. Yes; I told them that and would have done more. * * *" (The rest of the answer is immaterial.)

Again he testified:

"X. I hand you 'Complainants' Exhibit No. 1,' Mr. Byrne,

executed on the 14th day of January, 1908, by the stockholders, and I will ask you what you mean when you testify that this paper was executed to protect you?

"A. I had agreed personally, understand, if there was any money left over after the payment of the debts, that I would be willing and do all in my power to distribute that among the people least overdrawn. I didn't keep the books and had no access to them. I wanted to know exactly how each man stood, so that if there was anything left over there would be no comeback on the others, and I wanted this for my own protection, and, therefore, they all signed it.

"X. That is, if there was any distribution of the surplus?

"A. I there was any.

"X. If there was any, the ones least overdrawn were to receive it?

"A. That is it.

"X. That is the understanding you had with the men?

"A. What is that?

"X. What you have just testified to; if there was any money left after the payment of the debts it would be distributed among those least overdrawn?

"A. Yes.

"X. On this 14th day of January?

"A. Yes.

"X. 1908?

"A. Yes.

"X. Mr. Byrne, if the plant had sold for $20,000 ten days after the fourteenth day of January, would you have divided that surplus, according to that understanding?

"A. I certainly would."

In addition, there is the agreement between the company and all the stockholders, except Michael J. Byrne, which is the written evidence of that which was so clearly understood. This is the "Complainants' Exhibit No. 1," which, as John L. Byrne says, was drawn for the purpose of making this arrangement clear and fixing the amounts due from the several stockholders to the company. Mr. Brady says that this was drawn and signed so that "in case there should be a distribution of

surplus there would be a means of ascertaining how much each man should have deducted from his share.'' The sum of $100, which it was agreed should be paid to the stockholders, was not treated on the books of the company as payments on account of the purchase of the stock; but as to nine, at least, of the stockholders, was charged as loans, or advances, to them according to the plan theretofore adopted by the company before the cessation of its business.

In view of the clear understanding of all the stockholders, except Michael J. Byrne, of what was intended to be done, and of the things that were done, it seems unimportant that there was no actual authority given by the directors to the president and secretary to execute for the company the agreement between it and the stockholders (Complainants' Exhibit No. 1); or that Michael J. Byrne was not a party to it. It is equally immaterial that the minutes of the meetings of the stockholders and directors, drawn by Mr. Brady in advance, and which were afterwards copied into the minute book, show that certain stockholders wanted to withdraw and sell their stock and had signed a declaration to that effect, when admittedly no such paper was signed and no such action was either taken or contemplated by any of those stockholders, or by any one else, except as a legal step to accomplish the main purpose of making the directors liquidating trustees. Even if the appraisement had been other than a pretense and empty formality, there was no evidence of the selection of an appraiser by the withdrawing stockholders. So also it is immaterial that these stockholders assigned absolutely to the company their shares, for this also was but another step in the general plan; and it clearly appears that it was not intended, either by assignor or assignee, to be an absolute transfer, such as would terminate all rights, legal and equitable, of the assignor in the assets of the company. It is plain from all the testimony, and indeed from the undisputed testimony, that all the thirteen stockholders retained their rights as stockholders and were subject to their liabilities as debtors to the company; and that the corporation had in effect, though not in form, become dissolved, and the three directors constituted trustees to wind up its

affairs. It follows, necessarily, that they are subject to all the limitations put on trustees in dealing with the trust property for their own benefit.

Finding it so clearly established by the undisputed evidence that the three directors were actually constituted liquidating directors with the duties, powers and limitations applicable to all trustees, it is unnecessary to consider the probabilities to be easily and naturally inferred from the facts. Neither John L. Byrne nor Patrick J. Byrne had any real financial interest in the company, being indebted to the company to an extent far greater than their proportionate part of the surplus assets of the company. Some of the assigning stockholders were very slightly indebted to the company. Every one, including John L. Byrne, felt sure that there would be some surplus for division among the stockholders. Two of the liquidating directors received a salary for their services as such by an arrangement with the stockholders. Several of the retiring stockholders showed, not only curiosity, but their personal interest in the company by visiting the plant to ascertain the progress of the efforts to sell it. The payment of $100 to each stockholder could hardly have been considered a fair transaction of purchase of their shares of stock, for their interests in the company were not equal, some being indebted to the company in large amounts and others in triflingly small amounts, the range of difference being from $4,772.42 to $54.38. These and other facts throw side lights on what was done by the stockholders of this unsuccessful co-operative venture, and make clear the real purpose that ran through the technical forms and proceedings used.

The complainants, being entitled to an accounting from the liquidators of their stewardship, claim that they have not acted right'y towards the trust property; but that one of the trustees, and through him a corporation which he had promoted, had obtained a profit by a purchase and re-sale of the greater part of the property of The Christiana Window Glass Company. What was done by the liquidators? Two of them, Patrick J. Byrne and John L. Byrne, collected the accounts receivable, sold the manufactured product on hand and endeavored to sell the plant, paying themselves the salaries agreed

on and paying to the stockholders in installments the sum of $100 each, and charging the payments as additions to the overdrafts previously made by them. They also reduced the indebtedness of the company. In August, 1908, there remained to be disposed of only the plant, and apparently diligent but unsuccessful efforts were made to sell it. The creditors of the company were evidently not pressing for payment, but Michael J. Byrne had refused to renew his indorsement of the note of the company to the bank for $4,100, due November 17th, 1908. At a special meeting of the directors, all three of them, Michael J. Byrne, Patrick J. Byrne and John L. Byrne, being present, a resolution was adopted, that the company, "in order to get the best price for the plant and real estate owned by it and pay as far as possible its debts which are maturing, give an option to purchase said plant and real estate to John L. Byrne for the sum of $7,000, said option to continue for three months from date." A written agreement to that effect was signed by the company.

There can be no doubt that if John L. Byrne had taken title to that property, either directly from the company, or through a mesne contemporaneous conveyance to a third person, and had pa'd value for it, the stockholders would have had a right to avoid the transfer; and if he had resold it at profit, would have been entitled to participation in those profits, provided they had asserted their rights with promptness after knowledge of the transaction of the trustee. Such are the limitations upon trustees in dealing with themselves respecting the trust property, whether it be a sole trustee or one of several trustees, and such are the rights of the *cestui que trust*. There are two cases in the Courts of Delaware where the disqualification of the trustee to buy the trust estate was fully stated, namely, *Van Dyke v. Johns*, 1 *Del. Ch.* 93, (1819), and *Downes, et al., v. Rickards, et al.*, 4 *Del. Ch.* 416, 430. In both it is stated emphatically that the trustee cannot be the purchaser of the estate for which he is trustee, however honest the circumstances of any individual case may be. In the latter case, *Downes, et al., v. Rickards, et al.*, Chancellor Bates said:

"The principle is that one shall not act for himself in any matter with respect to which he has duties to perform or interests to protect for another. * * * The principle looks not merely to prevent fraud in the management of the sale, but to the broader object of relieving trustees from any possible conflict between duty and self-interest. * * * The prohibition does not depend upon any question of fraud or improper advantage made by the purchase. However fair the sale and adequate the price the Court will set it aside. In view of the difficulty of unraveling fraud in these transactions, the policy of the rule is to exclude the possibility of it by making the prohibition absolute."

Where the trustee remains in possession of the land of the *cestui que trust* which he has purchased, the sale is declared void; but where the trustee has parted with the land at an advanced price, he is made to account for the difference in value. *Van Dyke v. Johns, supra.* When the sale is declared void, or the difference in the price accounted for, all those who are interested may come in to share in the amount recovered, according to their respective interests. *Van Dyke v. Johns, supra.* The same principles apply to cases where one trustee buys from himself, or from his co-trustees. Numerous cases to the same effect were cited by the complainant.

By the minutes of the meetings of directors of The Christiana Window Glass Company it appears that the option was given to John L. Byrne by the directors; and by the answer of the company, which John L. Byrne was authorized by the directors to make for the company, and which is filed in this suit, it is stated that the agreement was made to enable John L. Byrne to organize a corporation to take the title to the property. It was a transaction, then, by which one of the three liquidating directors bought the chief asset of the corporation without the knowledge of the stockholders. Being one of three persons charged with the duty to sell the property, he became the purchaser of it, or at least obtained a right to buy it, and so obtained control of the disposition of it. The testimony establishes the ignorance of the complainants of the acts complained of until shortly before the filing of the bill. The defendants, meaning thereby chiefly the Byrne Gass Company and John L. Byrne, assert that the rule respecting trustees does not apply to this case, and cite numerous cases to support the

proposition, that a director may purchase from the corporation property of the corporation, the burden of sustaining the transaction by showing that it was proper, fair, made in good faith and for an adequate consideration being upon the director so purchasing, in order to retain the bargain and the profits thereof. *Hancock v. Holbrook, et al.*, 40 *La. Ann.* 53, 3 *South.* 351; *Skinner v. Smith, et al.*, 134 *N. Y.* 240, 31 *N. E.* 911; *Pneumatic Gas Co. v. Berry, et al.*, 113 *U. S.* 322; *Ryan v. Williams*, 100 *Fed.* 172; *Union Trust Co. v. Carter*, 139 *Fed.* 717; *Wyman v. Bowman*, 127 *Fed.* 257; *Barr v. Pittsburgh Plate-Glass Co.*, 57 *Fed.* 86; *Strobel v. Brownell*, 16 *Misc. Rep.* 657, 40 *N. Y. Supp.* 702; *Ashurst's Appeal, Estate of Montour Iron Co.*, 60 *St. Pa.* 290.

On the other hand, the complainants claim that in all the cases so cited the sale by a corporation to a director was either previously consented to, or subsequently ratified, by its stockholders, or that there had been laches in attacking the sale. The complainants' counsel assert, and probably correctly, that these cases show an application of the general rule that a trustee may, with the consent of the *cestui que trust*, purchase trust property, subject to an impeachment thereof for actual fraud. There is, in fact, an apparent divergence in the strictness of the rule applied respecting the dealings of the directors of the corporation with the corporation respecting its property. There are numerous decisions which prohibit a director from purchasing property of a corporation without the consent of the majority of the stockholders, including the following cases cited by the complainant: *Robbins v. Butler*, 24 *Ill.* 387; *Abbot v. American Hard Rubber Co.*, 33 *Barb.* (*N. Y.*) 578; *Hoyle v. Plattsburgh, etc., Co.*, 54 *N. Y.* 314; *Hoffman, etc., Co., v. Cumberland, etc., Co.*, 16 *Md.* 456; *Bowes v. Iron Co.*, 11 *Moore P. C.* 463. But even if it would have been a ligitimate transaction with respect to the officers of a corporation under ordinary circumstances, the purchase of the property by John L. Byrne was not proper under the facts in this case. Patrick J. Byrne and John L. Byrne, two of the three directors, in addition to the duties towards the stockholders which they had in common with all directors of other corporations, had assumed a special

and peculiar relation to those who had been legally stockholders, and still were stockholders equitably, notwithstanding the assignment of their stock and other evidence of withdrawal from relationship to the company. To the stockholders, legal and equitable, Patrick and John L. Byrne held the relationship of trustee and *cestui que trust*. They could not sell and convey the trust property to themselves, or to one of them, without the knowledge of the *cestui que trust*. If they did so, the *cestui que trust* could either repudiate the conveyance, or ratify it and obtain an accounting for the value received by the trustees. What was, in fact, done under the option?

The option to buy the plant was given by the two trustees to one of them, and it was so given in order that another corporation could be formed to take title to the property. This is proved by the minutes of the directors of The Christiana Window Glass Company, and by the answer of the company. Possessing this option, obtained from his co-trustees, this director, with his wife and son, about November 1st, 1908, formed a new corporation, the Byrne Glass Company, to which company the conveyance was made on November 18th, 1908, through Edward J. Byrne, acting concededly as a conduit, he having no interest or pretense of interest. These two deeds were not recorded until June 14th, 1909. Of this new corporation this trustee director was not only a stockholder, director and the president, but quite evidently the leading spirit and active manager, as well as the originator and promoter of it. True, he held only three of the 127 shares of the capital stock of the Byrne Glass Company, and his wife held 121 and his son three shares. It should be noted, however, that the evidence of John L. Byrne shows that his wife put only $400 into the company for shares, being money borrowed by her from her father, and that about $1,000 more, put into it for her, was money which John L. Byrne had made in carrying on business after the closing down of The Christiana Window Glass Company and was substantially his money and not hers (page 912 of the testimony). There was some evidence that John Doyle, the father of Mary E. Byrne, furnished $2,000 to her, and that this went to the Byrne Glass Company; but she did not obtain

an increase in the number of shares of stock held by her, but became thereby, at most a creditor of the company. Nor is it quite clear that the son actually paid for his three shares of stock, although he testified that he did so.

So it appears that probably the only person really interested as stockholder in the Byrne Glass Company, besides John L. Byrne, was his wife to the extent of $400, about one-third of the actual alleged capital, and no clear proof is given of the actual payment by her to the treasury of the company of even the sum of $400. None of the moneys of the stockholders of the Byrne Glass Company were used to buy the property of The Christiana Window Glass Company, for the only consideration claimed for that sale was the assumption of the debts of the grantor company. But even assuming that the wife and son had paid in full for the stock held by them, and were without notice or knowledge of the peculiar relationship of John L. Byrne to the plant, is the Byrne Glass Company in such a position that it can hold the title as against the stockholders of The Christiana Window Glass Company, or any profit which may have been made by a re-sale?

The defendants urge that the sale and conveyance was from The Christiana Window Glass Company to the Byrne Glass Company, and that a contract between the two corporations is not rendered vulnerable by the fact that John L. Byrne was a director in both corporations, and cited 3 *Thompson on Corporations*, 4079, 4080; *Rolling Stock Co. v. Railroad Co.*, 34 *Ohio St.* 450; *Booth v. Robinson*, 55 *Md.* 419; *Leavenworth v. Chicago, etc., Co.*, 134 *U. S.* 688, 10 *Sup. Ct.* 708, 33 *L. Ed.* 1064; *Pau'y v. Pauly*, 107 *Cal.* 8, 40 *Pac.* 29; *Public Hall Co. v. Bank* 144 *Ind.* 34, 42 *N. E.* 1097 *Library Hall Co. v P.tisburg Ass'n*, 173 *St. Pa.* 30, 41, 33 *Atl.* 744; *Shaw v. Davis*, 78 *Md.* 308, 28 *Atl.* 619, 23 *L. R. A.* 294; *Manufacturers, etc., Bank, v. O'Reilly*, 97 *Mo.* 38, 10 *S. W.* 865; *Genessee, etc., Ry. Co. v. Retsof, etc., Co.*, 15 *Misc. Rep.* 187, 36 *N. Y. Supp.* 896; *Burden v. Burden*, 159 *N. Y.* 287, 54 *N. E.* 17.

But this rule, if it be a sound one is not applicable here, for the facts in this case show that the transaction with the Byrne Glass Company should be tested by the same rules as

though it had been with John L. Byrne, or his wife, or the two together.  The Byrne Glass Company was formed to take title to the plant, and paid no money for it, but, as a consideration, assumed the payment of the debts of the grantor, which were, in fact, paid after the sale of the plant by the Byrne Glass Company, and from the proceeds of that sale.  The company consisted practically of John L. Byrne and his wife, and there is no equity in favor of the stockholders of the Byrne Glass Company against those of The Christiana Window Glass Company.  A trustee cannot sell trust property to his wife, any more than to himself, because of the unity which exists between them in the marriage relation.  *Bassett v. Shoemaker*, 46 *N. J. Eq.* 538, 20 *Atl.* 52; *Dundas' Appea'*, 64 *Pa. St.* 325.

Hav'ng reached the conclusion that John L. Byrne was in legal effect one of the trustees in liquidation of the affairs of The Christiana W ndow Glass Company, by special arrangement, and not entirely as the ordinary result of the relationship of stockholder and director, it is not a question of intercorporate dealings of independent bodies, but one where the ordinary rules applicable to trustees dealing with corporate property. Should a court of equity allow a trustee to sell and convey trust property to a corporation organized by the trustee to buy it, and of which purchasing corporation the trustee and his wife, or even the trustee, his wife and son, were the sole stockholders,. particularly if there is grave doubt that the son had paid value for his stock in the purchasing corporation?  To state the question is to show the answer.  No court would justify a trustee in organizing a corporation in which he and his wife were the only stockholders to buy trust property from himself.  This is surely within the danger line where there may be a mixing up of interests, and that conflict of duty and self-interest which courts try to prevent by enforcing rigidly a rule which prohibits a trustee from dealing with himself.  The possibility of fraud is excluded by such absolute prohibition.  This prohibition is the ounce of prevention of fraud or injustice which is better than the pound for the cure thereof.  The trustee is relieved even of temptation to deal unfairly with the trust property, or to obtain some advantage from the management

of it, by the uncompromised rigidity of the prohibition against his buying it directly or indirectly, even for full value, unless the beneficiary with knowledge which enables him to deal on equal terms with the trustee consents to, or ratifies his act, or unreasonably delays to avoid the transaction after notice or knowledge of it.

There is in the bill no allegation of actual fraud in the transaction, but only of illegality therein. There are, however, some indications of secrecy by the withholding of the deeds from The Christiana Window Glass Company to Edward J. Byrne and from him to the Byrne Glass Company for nearly seven months, which if necessary might be considered as evidence of fraudulent intent, and there is also evidence as to the inadequacy of the price fixed for the land. But as the limitation on the dealings of the trustee is independent of fraud, or inadequacy of price, no stress is laid on the above features of the case.

What was done with the property by the Byrne Glass Company? After using the plant for a short time in its business, the Byrne Glass Company sold the real estate to Bennett, Brown and Bennett, Incorporated, for $18,750, and by deed dated July 17th, 1909, conveyed the property to the purchaser. The purchase price was paid and secured as follows: $6,250 in cash and a purchase money mortgage given for the balance, $12,500, payable in four years in installments, with interest at the rate of five *per cent.* This mortgage was assigned by the mortgagee to Artisans' Savings Bank as collateral security for the payment of $6,000 loaned August 5th, 1909, to the Byrne Glass Company by the assignee. Bennett, Brown and Bennett, Incorporated, also made a second mortgage to William S. Prickett for $1,200. This conveyance and these mortgages and the assignment of the purchase money mortgage, are not alleged to be invalid, nor is it sought to set them aside. The rights of the grantee and of the assignee of the purchase money mortgage are recognized. It is the interest of the Byrne Glass Company in the mortgage that the complainants seek to reach. It is the refusal to account with the stockholders of The Christiana Window Glass Company for the proceeds of the sale of

the property of the company which is the cause of action. By the bill it is prayed: (1) That each of the complainants be declared to be the owners of ten shares of stock of The Christiana Window Glass Company; (2) that the officers and directors of that company account for the sales of the property of that company; and (3) that the purchase money mortgage for $12,500 be declared to be the property of The Christiana Window Glass Company. There is no prayer respecting the Byrne Glass Company, except such as is incident to the last prayer, but under the prayer for general relief the complainants may be afforded whatever relief is needed by a decree against that company.

John L. Byrne being disqualified to purchase the trust property, if the conveyance thereof had been made to him and he still held title to it, the conveyance would be declared void. The same prohibition applied to the conveyance to the Byrne Glass Company, and if it still held the legal title, the deed would be declared void. Inasmuch as that company paid no value for the property, but as a consideration for the conveyance assumed payment of the debts of The Christiana Window Glass Company, and paid these debts after the re-sale by it of the property to Bennett, Brown and Bennett, Incorporated (now called Peninsula Cut Stone Company), out of the proceeds of that sale, there is no equity to be adjusted with the Byrne Glass Company, or its stockholders. As the sale to Bennett, Brown and Bennett, Incorporated, was a *bona fide* purchase without notice of any trust, and for value paid, the conveyance to it cannot be avoided. So also the transfer to the Artisans' Savings Bank is valid as a transfer as collateral security for the loan of $6,000 made by it to the Byrne Glass Company.

Therefore the prayers of the bill will be granted and a decree will be made accordingly. Each of the complainants will be declared to be equitable owners of ten shares of the capital stock of The Christiana Window Glass Company and entitled to their rights as such, subject to their liabilities as debtors to the company; and the purchase money mortgage will be declared to be an asset of The Christiana Window Glass Company, subject to the debt due the Artisans' Savings Bank. In addi-

tion, the preliminary injunction will be so modified, and such other orders made in the decree, as will give the relief appropriate to the facts in accordance with the conclusions herein announced. Concerning the form of the decree, counsel will be heard, unless it be agreed on between them. If possible, the several and respective rights of all parties should be so settled in this suit and by this decree, even if an amendment to the bill, or the prayers therof, be necessary.