(16 Misc. Rep. 657)

STROBEL et al. v. BROWNELL et al.

(Supreme Court, Special Term, Monroe County. December, 1895.)

1. CORPORATIONS—CONTRACTS WITH DIRECTORS.
   A contract between a corporation and one of its directors is not void, but only voidable.

2. SAME—WHEN VALID.
   A contract between a corporation and one of its directors to do certain work is not improper, where it appears that the corporation had always had such work done by contract, and that it had no facilities for doing the work itself, and there was no salaried officer of the company whose duty it was to superintend the work.

Action by William D. Strobel, Jr., and others, as stockholders of the Wheatland Land-Plaster Company, against Sylvester Brownell and others, to cancel a contract made by said company with defendant Brownell. Complaint dismissed.

Frank E. Blackwell, for plaintiffs.

J. W. Taylor, for defendants.

RUMSEY, J. The Wheatland Land-Plaster Company was organized in the year 1891 for the purpose of mining stone, which was suitable to be ground into plaster, and grinding it and selling it after it was ground. The company leased lands upon which the stone was to be found, and erected a mill upon Allen's creek, some little distance from the place where the stone was to be mined, and commenced business in the early part of the year 1891. The stock was divided into 100 shares, of which the defendant Sylvester Brownell owned somewhat more than half, and the plaintiffs were owners of 38 shares. From the time of the organization of the company, the plaintiff, Mr. Strobel, was a director and the treasurer of it, and, as it would seem, had active charge of the management of the business. The season for grinding and selling plaster stone commences in December or January, and lasts until the month of September or October; and for two or three months from that time, until the season commences, there is no market for plaster, and none is mined or ground. In prosecuting the work of the company, it was necessary to draw the stone, when mined, from the mine to the mill, to be crushed. This work was usually done by hired teams, because it would not be profitable for the company to own teams which could not be worked continuously during the year. So far as can be ascertained from the proof, it was the custom to hire this work done at an agreed price per ton, although whether that is so or not is not perfectly certain from the evidence, nor is it important. It appears from the testimony that the receipts from the business of the company had been used for the increase of the plant, and the purchase of betterments, and that no dividends had been paid. The precise amount, however, which had been used for those purposes was not made to appear. It is quite clear that in the early part of the year 1893, and shortly before that time, the company was in some financial difficulties, the cause of which is not very clear. As is not strange under such circumstances, as the result of the financial difficulties it is quite evident that there arose personal difficulties between some of the directors, probably because of the dissatisfaction with the condition of affairs, although who was to blame for such condition of affairs does not appear, and perhaps it is not important. What that condition was, however, is very clear. In the early part of January the bills payable by said company amounted to $1,000 or $1,500, and the amount of cash on hand was less than $50. There were some moneys receivable for sales of goods, but those moneys would not be available for two or three months. The creditors were pressing, and it was necessary to have the money to liquidate the debts of the company at once. Nobody seemed to be

willing to do anything by way of enabling the company to borrow money, although at that time it is said that its credit was perfectly good. Such being the condition of affairs, the directors, at a meeting held on the 17th of January, at which all the directors except Brownell and Hadley were present, voted that the company should incur no further expenses; that all the employés should be discharged, on the 21st of January, until such time as it should be deemed advisable to resume work. And the treasurer, Mr. Strobel, was instructed to carry that resolution into effect. Such seems to have been the condition of affairs on the 25th of January, 1893, when the annual meeting of the stockholders took place. At that time there was an election of directors, and substantially the old board of directors was re-elected. Strobel and Pease, however, refused to serve as such, and the defendant Helen B. Brownell and Daniel P. Campbell were elected directors in their places. It does not appear, however, that Campbell ever served as director. The minutes show that his resignation was accepted on the 6th day of March, 1893. At a meeting of the new board on the 6th day of February, 1893, it was resolved that the treasurer should be authorized to make a contract, to be good until the annual meeting in January, 1894, for hauling, crushing, grinding, and loading plaster into the cars at 50 cents a ton. The person with whom the contract should be made was not specified in the resolution. Afterwards, and presumably in pursuance of that authority, the treasurer advertised for bids for doing that work, and some other work of the same kind, which was substantially everything necessary to be done to mine, manufacture, and market the plaster; saying that the bids would be opened on the 13th of March, 1893. It seems that at that time but one bid was offered, and that was made by the defendant Sylvester Brownell, and in pursuance of that bid a contract was made with him by which he agreed to load and haul the stone from the mines of the company to the mill; to crush and to grind it; to load the ground plaster into the cars ready for shipment; deliver all supplies needed for mining plaster to the miners at the mines; to take to Mumford or Caledonia everything about the mill for repairs that can be taken in a one-horse wagon, and to return the same after being repaired; to furnish oil for the mill; to keep all belts in repair; to run the mill night and day, if directed; to sharpen the stone and keep it in good condition; to keep the machinery well oiled and in good working order,—for 50 cents a ton for plaster delivered on board the cars. This is the contract which the plaintiffs desire to set aside. At the time of making of this contract, Brownell was the president of the corporation.

There is no rule of law which forbids the director of a corporation from making a contract with the company. It is true, the director stands in the corporation in a fiduciary situation; and he is bound, under all circumstances and at all times, to look to the interests of the company whose agent he is, and he is not at liberty at any time to put himself in any position by which he can make an undue or improper profit out of the corporation for his own benefit. But he may make a valid contract with it, provided that

in doing so he deals fairly and honestly towards the stockholders who have appointed him their agent. Barr v. Glass Co., 17 U. S. App. 124, 141, 6 C. C. A. 260, and 57 Fed. 86. Every such contract made by a director of a company with a corporation is looked at with suspicion, and if the transaction is attacked the burden is upon the agent of the corporation, who has contracted with it, to show that it was honest and fair in all its parts, and that he has made no more profit out of the contract than any other person might properly have made. Gamble v. Water Co., 123 N. Y. 91, 25 N. E. 201. Such a contract is not void, but is only voidable at the suit of the corporation or of the stockholders, if the corporation refuses to sue, when it shall be made to appear that the contract is one which the director ought not to have entered into. Not being void, it necessarily is good until it has been set aside. Barr v. Railroad Co., 125 N. Y. 263, 26 N. E. 145. But it will not necessarily be set aside unless, in view of all the circumstances, it appears that the contract is one which ought not to have been made, and by means of which the director who has entered into it has imposed upon the company, or taken advantage of his position to get from the company a larger compensation than he ought, or a greater profit than should have been made for the work which was done. Such, I think, is the fair result of the cases which have been cited above, and is the general consensus of authority on that subject. The leading case on the subject is Oil Co. v. Marbury, 91 U. S. 587. That was an action brought by the corporation against a director to set aside a sale of the property of the corporation upon a mortgage which had been given to the director for money loaned by him to the corporation. The charge was that the money was loaned at an improper rate of interest, and that the director took advantage of the necessity of the corporation to make the loan and obtain the security. The supreme court of the United States, after a careful examination, affirmed the judgment of the court below, refusing to set aside the transaction, and holding the law to be substantially as stated above. The case of Munson v. Railroad Co., 103 N. Y. 58, 8 N. E. 355, is not applicable to the condition of affairs shown here. The question presented there, as appears by the opinion of Judge Andrews, is whether the plaintiffs were entitled to the aid of the court to enforce an executory contract between themselves, on one side, and the defendant corporation, on the other, for the sale of the property of the plaintiffs to the corporation, in a case where one of the plaintiffs, at the time the contract was made, was a director of the purchasing corporation, and took part in making the contract upon which the action was brought. It is said that in that case the plaintiff stood in the attitude of selling as owner, and purchasing as trustee; and the result of the case was simply that when that condition of affairs appeared the court would not examine into the advisability of the contract, but if the corporation objected to carrying it out the court would not lend its aid to a specific performance. It is not a case where the contract had been substantially

carried into effect for it, or where the action was brought for the purpose of setting aside. In such a case the court is at liberty to look into the contract, and the circumstances under which it was made, and say whether it was a fair contract for the corporation, and one which, upon the whole, the director might properly enter into. This was done by the court in the case of Oil Co. v. Marbury, 91 U. S. 587, and in Barr v. Glass Co., 17 U. S. App. 124, 6 C. C. A. 260, and 57 Fed. 86, in which the court held the contracts valid, and refused to set them aside. The case last cited, decided by the circuit court of appeals for the Third circuit, is a very instructive one upon the subject. In this case, under all the circumstances, I do not think that it was at all improper for Mr. Brownell to make this contract with the company. It appeared that the contract was to do substantially what the company had always employed men to do; that there were no teams or materials of the company on hand with which the company could do the work itself. There was no salaried officer of the company whose duty it was to superintend this work. It is fair to infer, from the small amount of stock, and the circumstances of the organization of the company, that it was never intended to pay any person in the company a salary sufficient to warrant the hiring of a man competent to superintend this work. It had been done by Strobel without salary, so far as appears. What were the terms upon which he did it is not clear. Mr. Brownell says that Strobel received 20 cents a ton for doing a portion of the work which he agreed to do for 50 cents a ton. This Strobel denies, but he does not say precisely how he had been in the habit of doing it, or what was the manner in which the company paid for it. So it will be seen that making a contract for doing this work was in the ordinary course of business of the company, and something of which no complaint could be made.

Was the price charged for doing this work, then, so exorbitant that it can be said that it was fraudulent, as against the company, to agree to pay it? Brownell himself says that it cost him more than the compensation he received to do the work. Mr. Strobel says that the cost to the company, when he was the treasurer, for hauling from the mine, grinding, loading into the cars, and weighing, was 45 cents, so near as it was possible to get at it, and that that was the price that he was accustomed to pay. But it appears from the contract that Brownell was to do considerably more than that. He was not only to load and haul from the mine, and grind the stone and load it on the cars, but he was to deliver all the supplies needed for that purpose at the mine; to keep the machinery in good working order; to draw the tools to be repaired when it was necessary. Precisely how much would be the expense of doing that work, has not been made to appear. It does appear, however, from the estimate of Brownell and one other witness, that the price of 50 cents a ton was not more than it was reasonably worth. In coming to a conclusion as to this contract, it is to be taken into consideration that it was let to the defendant Brownell openly and without any concealment, and that bids were advertised for, and that any person had an opportunity to bid upon the

work.   It seems that there were several people who understood the value of it, and who had in mind, at least, to bid for the job, and none of them saw fit to make any bid, so that it would seem that the work was not very profitable.   It appears from the testimony that since the contract was let to Brownell the company has paid a dividend of 10 per cent., so that certainly this work has not been paid for at a loss to the company.   At the time this contract was let, it appears affirmatively from the testimony of the plaintiffs themselves that there was no money of the company with which to do the work; and, unless some such means as this had been taken to cause it to be done, the company would have had to suspend operations, as it did resolve to do before this contract was let.   It is fair to assume, from all these things, that the letting of this contract was essential for carrying on the business of the company; and I think that, so far from being an invalid or improper contract, the making of it showed good business judgment on the part of the directors.   For these reasons the action to set it aside must fail, and the complaint must be dismissed, with costs.

Complaint dismissed, with costs.