(75 Misc. Rep. 539.)

### GLOBE WOOLEN CO. v. UTICA GAS & ELECTRIC CO.

(Supreme Court, Trial Term, Oneida County. February, 1912.)

1. CORPORATIONS (§ 401*)—POWERS AND LIABILITIES—REPRESENTATION BY OFFICERS—DUAL DIRECTORSHIP.

Where defendant, a corporation engaged in generating electricity and making gas for power and lighting, having full knowledge of the situation, entered into contracts with the plaintiff, a manufacturing corporation, to furnish electric current to operate its mills for five years, the fact that plaintiff's president was a director in both corporations does not, in the absence of fraud or bad faith, render the contracts voidable, where he did not vote on their execution and took no part in reference thereto as director of defendant.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1363, 1364, 1595; Dec. Dig. § 401.*]

2. CORPORATIONS (§ 426*)—REPRESENTATION BY OFFICERS—ACQUIESCENCE.

Where the stockholders are dissatisfied with the acts of directors in entering into contracts, they should repudiate them within a reasonable time, and, where there has been an unreasonable delay, the contracts remain in force.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1704, 1707, 1708, 1710–1716; Dec. Dig. § 426.*]

3. SPECIFIC PERFORMANCE (§ 4*)—CONTRACTS ENFORCEABLE—POWER AND LIGHTING CONTRACT.

Where a power and lighting company, on ascertaining that its contract to furnish electric power to a manufacturing company for a number of years would result in inevitable loss, made unsuccessful efforts to be released therefrom, and the manufacturing company, by notice availing itself of an option in the contracts, elected to continue them for five years, whereupon the power company served notice that the power would be shut off at a given date, a court of equity will not grant specific performance, but will restrain the power company from shutting off the power for a reasonable time and leave the manufacturing company thereafter to its right of action for breach of contract, if any.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 4; Dec. Dig. § 4.*]

Action in equity by the Globe Woolen Company against the Utica Gas & Electric Company. Judgment for plaintiff.

For judgment reversing same, see 136 N. Y. S. 24.

Miller & Fincke, for plaintiff.
Lewis, Watkins & Titus, for defendant.

DEVENDORF, J. This action is brought to compel specific performance of two contracts entered into by the respective parties and

---

to enjoin the defendant, during the life of the contracts, from discontinuing or refusing to deliver the electric current to the mills of the plaintiff in pursuance of the terms thereof. The action was commenced November 12, 1910, and an order was granted, by a justice of this court, restraining the defendant, during the pendency of the action, from discontinuing or refusing to supply such electrical current and power.

The plaintiff is a domestic corporation engaged in the manufacture of woolen cloth and yarns, at Utica, N. Y., and has two separate mills, in one of which worsted yarn and cloth are manufactured, and in the other yarn and cloth. Each mill has a separate engine and boilers, managed by separate engineers and firemen, and its own dye house.

Up until the time the defendant entered into the contracts in question, the mills were largely operated by steam; and an important fact connected with that was that they were heated, and the dyehouses operated, almost entirely by exhaust steam.

Mr. J. F. Maynard, as early as 1903, obtained control of a majority of the stock of plaintiff, and thereupon became one of its directors and president, and, as such, a member of the executive committee. The capital stock of plaintiff was and is $300,000, consisting of 3,000 shares of $100 each.

The defendant is also a domestic corporation, with a capital stock of upward of $2,000,000, and has been engaged in generating electricity and in manufacturing gas, which it sells for power and lighting purposes. It has a water power at Trenton Falls and two power stations in the city of Utica. It was organized in 1902 by the consolidation of the Utica Electric Light & Power Company, of Utica, N. Y., and the Equitable Gas Company, of Utica, N. Y. A majority of its stock is and has been controlled by Anthony N. Brady, while Mr. William E. Lewis is the largest stockholder among those of the minority; and its directors have been so selected that a majority of them, known as the Brady directors, represent the majority stock, while the so-called Lewis directors represent the minority.

At, and for a long time prior to, the making of the contracts in question, Mr. Maynard, the president and a director of the plaintiff, as aforesaid, was one of the directors of the defendant and was known as a Brady director. At the time he became such, there was but one share of stock issued to him, which he indorsed in blank and returned, and this is the only stock he ever owned. He was what is sometimes termed a "dummy director," having no financial interest in defendant, although he was chairman of its executive committee, which consisted, besides himself, of Mr. Lewis and Mr. Beardsley.

The defendant's by-laws provide that the executive committee shall have, when the board of directors is not in session, all the powers of the board requisite for the conduct of the business affairs of the company, subject, however, to any limitations which the board may establish.

As early as 1903, a representative of the defendant came to plaintiff's mills and stated to Mr. Maynard that he would like to take up

the question of operating the plaintiff's mills by electricity. They had several conversations in reference thereto which resulted in plaintiff's giving the defendant an opportunity for a full examination of its plant in every way, with the right to make tests of the horse power capacity of the boilers and engines, and statements were also furnished by the plaintiff of the amount of coal used; and, following that, there was a complete examination, on the part of the defendant, of both the woolen and worsted mills and dyehouses connected with them, as well as the operation thereof. It resulted in a proposition being submitted on the part of the defendant to furnish electric current for the operation of the mills at so much a kilowatt hour. Mr. Maynard, representing the plaintiff, would not entertain a proposition along that line, and called attention to the fact of his lack of knowledge as to what the cost of operating the dyehouses would be, and finished by declaring he would take no proposition on the kilowatt hour basis. He further suggested that it would cost a good deal of money to equip for electricity and, unless the defendant was ready to make a proposition which would give the plaintiff a fixed saving, he would not go to that expense. All further negotiations were at that time dropped.

The matter was again considered to some extent in 1904, and tests were made as to power, friction load in each mill, coal consumption, etc., which were reported to and paid for by plaintiff. Nothing further was done at that time. Finally the matter was taken up in the fall of 1906 and resulted later on in the contracts in dispute. This time the same representative of the defendant called upon Mr. Maynard at the office of the plaintiff and asked to again take up the question of operating the mills by electricity. Mr. Maynard said:

"My position is that, if you want to examine the plant as we are running now and make us a proposition by which you will give us a fixed saving, why, go ahead and make your examination. If we can agree on the terms, why, we will contract with you. But we will not entertain any proposition on the kilowatt hour basis. The only thing we will entertain is that you must operate the mills and you must heat them and light them and operate the dyehouses, in fact, run the whole plant; and it has got to be on a basis that will make a saving to us."

Prior to this, tests and examinations had been fully made, as above stated, and were then again made as to boiler horse power of the boilers and the engine horse power of the engines of both mills, and information obtained as to the amount of coal consumption necessary to run each mill in connection with each dyehouse, as well as separately from it. These later examinations and tests were carried on during a period of several weeks. The question of night running was also taken up and, to some extent, considered.

Subsequently the matter of entering upon these contracts in question was duly considered by the directors and executive committee of the defendant, and the contracts were entered into with a complete knowledge of the situation as to what had been done leading to their execution. Mr. Maynard, the president and a director of the plaintiff, and greatly interested in its success, was, as heretofore stated, on the board of directors of the defendant at the time the contracts were entered into; but it appears that he did not vote upon the ques-

tion as to their execution and took no active part in reference thereto as such director of the defendant. It appears from the evidence in the case, as I construe it, that he was at all times in question actively looking after the interests of the plaintiff and must have appeared plainly in that light to his associate members of the defendant's directorate, and at no time did he act, or assume to act, or represent, the defendant therein.

The first proposition submitted by the defendant was that of October 18, 1906, and applied to the worsted mill only. It subsequently was accepted by the plaintiff and became the contract between the parties as to that mill. It was in or about February, 1907, when negotiations were undertaken between the parties with reference to the supply of electricity for the woolen mill. A proposition was submitted on behalf of the defendant in reference to it which was substantially in the same form as that of the worsted mill proposition, except a clause was inserted, at the suggestion of Mr. Maynard, providing that, if, in the event of accident, there was a shortage of power by the defendant, it must furnish the plaintiff power in preference to all other customers, excepting the city of Utica. He also asked for the insertion of a clause that the contract would apply to any extensions or additions in the plaintiff's plant. Both clauses were inserted, and, February 9th, the proposition was submitted for the electrical current to be supplied to the woolen mill and thereafter accepted and became the agreement as to that mill.

The contracts provide for the substitution of electricity in place of steam for the purpose of motive and operating power. The defendant agreed to supply plaintiff with electricity, furnishing therewith sufficient power to operate and light the mills, at a maximum of .0104 per kilowatt hour, and guaranteed that plaintiff's cost of coal for heating the mills and for dyeing, together with the wages of one mechanic and one fireman and the cost of operating and lighting the mills with electrical current, would be $300 less per month than the cost to the plaintiff of one engineer, two firemen, and coal used in the boilers for supplying the mills with power and steam for lighting, operating, heating, and dyeing for the corresponding month in the previous year. The expression "in the previous year," of course, means in the year previous to the substitution of electricity in place of steam, both parties, I think, having given this construction to the contract, the first year, under the worsted mill contract beginning April 1, 1907, and under the woolen mill contract, February 1, 1908.

The mills of the plaintiff were arranged so that the electric power was installed therein and the parties have continued operating under the contracts in question. It appeared, after a time, to the defendant, that it had made a serious mistake in entering into such contracts. It was firmly held to an inevitable and serious loss; efforts were made to obtain from the plaintiff a release or a change from the losing situation in which it was placed. There was no disposition on the part of the plaintiff to yield any of the advantage which it had obtained and possessed; and, in 1910, it served upon the defendant a notice

that it availed itself of the option of the contracts and elected to continue them for five years further.

The situation, it may readily be seen, then became unendurable to the defendant; and it served a notice that the power would be shut off at a given date fixed in such notice. It was then that the plaintiff sought the equity powers of the court and brought this action to compel the defendant to continue to furnish it the electrical current as agreed and, also, to enjoin it from shutting it off during the pendency of the action.

[1] The defendant cannot, and does not, dispute its contracts, neither can it successfully challenge their enforcement because of fraud, as its proof falls far short of that mark; but it says that the contracts are voidable because Mr. Maynard occupied the position of a dual director, that he, as president and director of the plaintiff, brought about these contracts with the defendant while he was acting as one of the defendant's directors, and consequently the contracts are voidable.

The plaintiff meets that allegation with the claim that Mr. Maynard took no part whatever in the directors' meeting of the defendant which resulted in the making of the contracts, and that it was well known that his financial interests were entirely with the plaintiff, and that the defendant had the fullest and freest opportunity to make tests of the boiler and engine power of the mills, the method of operation thereof, the amount of heat, light, steam, and motive power required, and that the agreements were in every way freely, fairly, and openly entered upon, and that there is no reason why a court can say that they are voidable. It also claims that the long delay of the defendant after the parties began to operate under the contracts has been such that in no way or manner can the contracts be declared to be of no effect and force.

I have come to the conclusion herein that the contracts are not voidable. They were entered upon, as above stated, after a most complete examination of the condition of things existing about the mills. There was no fraud or concealment which, to the slightest extent, justifies interference on the part of the court.

I have adverted to the facts stated hereinbefore only for the purpose of placing briefly upon the record the relative situation of the parties leading up to, and at the time of, the execution of the contracts. Men of large experience and ability in business affairs and possessed of technical knowledge with reference to their respective concerns, after due deliberation and proper investigation, entered into these contracts.

It is true that one party has decidedly the worst of the bargain, and the other correspondingly the best of it. I think this condition exists because of a failure to take into consideration the great value of the exhaust steam and the further fact that a large quantity of coal would be needed for different heating purposes. These contracts are serious in their consequences, involving many thousands of dollars of loss to the defendant; but I must deal with the parties as I find them and cannot arbitrarily, in equity, set aside or avoid the contracts which they knowingly and upon due consideration executed.

It is claimed by the defendant, as hereinbefore stated, that the contracts are voidable because Mr. Maynard was a director in each of the contracting corporations.

After a careful examination of the authorities, I am firmly convinced that a dual or common directorship in itself alone does not render a contract between the corporations so represented voidable. I am aware of a conflict of opinion and dicta upon this question in this and other jurisdictions.

The relations of the director and his corporation are and should be scrutinized closely by the courts, and justly so. He should not be permitted to profit individually at the expense of the stockholders of the corporation in a transaction which he himself conducts, manages, or brings about. In that respect he comes within the line of the authorities which firmly prohibit contracts between a person acting as trustee and himself individually. Such contracts are clearly voidable and may be repudiated at any time at the mere will, or even whim, of the cestui que trust. Davoue v. Fanning, 2 Johns. Ch. 252.

If the director enters into a contract between himself and his corporation, and assumes to act for both, his contract is voidable. Coleman v. Second Ave. R. R. Co., 38 N. Y. 201; Butts v. Wood, 37 N. Y. 319; Hoyle v. Plattsburgh & Montreal R. R. Co., 54 N. Y. 314, 13 Am. Rep. 595; Cumberland Coal & Iron Co. v. Sherman, 30 Barb. 553; Munson v. Syracuse, Geneva & Corning R. R. Co., 103 N. Y. 58, 8 N. E. 355; Barr v. New York, Lake Erie & Western R. R. Co., 125 N. Y. 263, 26 N. E. 145; Jacobson v. Brooklyn Lumber Co., 184 N. Y. 152, 76 N. E. 1075.

He should not be permitted to act in his own interest on the one side and in the capacity of trustee or representative upon the other, as, in that event, his own interest and his duty conflict. But, where the director acts only for himself, taking no part in the proceedings which lead to the consummation of the contract, and there being no fraud, conspiracy, bad faith, or concealment, a valid contract may be made between a corporation and one of its directors. Gamble v. Queens County Water Co., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527; Strobel v. Brownell, 16 Misc. Rep. 657, 40 N. Y. Supp. 702; Vonnoh v. Sixty-Seventh Street Atelier Bldg., 55 Misc. Rep. 222, 105 N. Y. Supp. 155. These authorities, I think, are to the effect that such a contract is valid.

I have referred briefly to the relations between a director and his corporation, as to contracts he enters into with it, because the attack made upon the contracts in question brings the issue of law here largely within the scope of the principles applicable under such circumstances.

Three conditions may arise in a business transaction between corporations having directors, one or more of whom are directors in both corporations: First, where the common director votes and his vote is necessary to make the contract, I am of the opinion that such contract is voidable. Burden v. Burden, 159 N. Y. 287, 54 N. E. 17; Continental Ins. Co. v. New York & Harlem R. R. Co., 187 N. Y. 225, 79 N. E. 1026. Second, where the common director votes and his

vote is unnecessary to make the contract, I think the contract is valid if it is made to appear that it is one which ought to have been made and has been entered into in good faith, and is free from fraud, concealment, individual advantage, and is fair and reasonable in its results. Third, where the common director does not vote or take part in the proceedings, I think the contract is valid and binding. U. S. Rolling Stock Co. v. Atlantic & Great Western R. R. Co., 34 Ohio St. 457, 32 Am. Rep. 380; Cowell v. McMillin, 177 Fed. 25, 100 C. C. A. 443; Genessee Valley & Wyoming Ry. Co. v. Retsof Mining Co., 15 Misc. Rep. 187, 36 N. Y. Supp. 896; Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

Maynard, the common director, did not vote at the meeting of the defendant's directors when these contracts were under consideration or when they were adopted. The evidence, so far as I am able to discover, does not contain an expression anywhere, on his part, in favor of or against the propositions considered. If the contracts are voidable solely because he occupied a position on both boards of directors, then a condition of things is presented which renders it difficult to conduct intercorporate action, whenever there is a common directorship, to any extent whatever. This in many cases would not be equity.

We can readily see, in a multitude of operations carried on about us by the many corporations, where matters of great interest to the stockholders of both concerns would be involved, that financial loss or disaster and litigation must come, to the detriment of innocent parties.

Of course, it needs no argument to show that, where a director or a trustee attempts to contract with himself or act upon both sides, consequences might follow which would not be tolerated by the court; but, where he only acts on the one side, and his intentions and his position are well understood to his associates who act in good faith, the courts can then readily approve of a contract entered into in that way.

Undoubtedly many corporations have men upon their board of directors who are directors in other corporations; and I think it would be legal error for this court to say that the sole fact of such dual directorship, where the director does not act, renders the contracts between the corporations voidable.

In my opinion, therefore, the contracts between these two corporations are not voidable because of the fact that Mr. Maynard was a director in both; there being an entire absence of fraud or bad faith shown in the case, and it appearing that he in no way or manner acted as a director for the defendant in the transaction.

[2] Upon the other question, as to the long time which the defendant has permitted to elapse after it entered upon its contract relations with the plaintiff, I regard that as also extremely serious to the defendant. The defendant acquiesced so long in the situation created by the contracts, and failed to take advantage of any claim which it may have had, that it may be said with considerable force that it saw fit to rest upon its rights, and that it is now too late to change them.

The rule as to the time within which the party should make a claim, at all events, must be within a reasonable time. If the stockholders are dissatisfied with the acts of their directors, they should repudiate them within such time, which, I think it has been said, means at the annual meeting for the election of directors, when they can elect a new board who can take necessary action to annul a voidable contract.

This long delay on the part of the defendant cannot be said to be a reasonable delay; and I think the better authorities would justify the court, even if these contracts were voidable, to hold that the parties have rested too long upon their rights and there had been unreasonable delay, and that, consequently, the contracts must be considered to be, and remain, in force.

There are other questions urged by the respective counsel; but, having arrived at a conclusion upon the main point in the case, as to the strength of the contracts, it will be unnecessary to consider or discuss them.

[3] The contracts are valid and were valid when entered upon. Having arrived at that decision, the next question is: Should specific performance be decreed? I think not. The contracts are burdensome to the defendant. It is largely a public service corporation, furnishing for the use of the people at large gas and electric power. Under its contracts with the plaintiff, it must, under certain conditions, shut off its supply to all others but the city of Utica and the plaintiff. It has already lost many thousands of dollars, and inevitably, if specific performance is awarded, must lose much more; if action is brought against it for breach of contract, it may be called upon to respond in payment of substantial damages.

Neither do I see any particular reason why a decree for specific performance should be granted against this defendant any more than against an individual upon a contract to sell and deliver goods or render services. The parties to this action control large properties, their affairs involve much money, but that is not in itself sufficient to give them a different status before the court than that ordinarily occupied by the individual litigant.

The plaintiff has its common-law right of action for damages, if there is a breach of contract on the part of the defendant; and I deem it more in line with the promotion of justice to leave the parties to their law remedies in this case rather than to attempt to force literal performance of a harsh and ironsided contract. However capable the men were who entered into it, and however much consideration they gave it, the truth remains that the contracts are not in terms evenly balanced between the parties and are bound to bring great loss to the defendant.

Specific performance will never be decreed when it would be inequitable. It is immaterial whether the fact that it is inequitable arises from the provisions of the contract or from external facts or circumstances which affect the situation and relations of the parties, for in either case it may constitute a sufficient ground for a court of equity to withhold this peculiar relief and to leave the parties to their legal remedy. Stokes v. Stokes, 155 N. Y. 590, 50 N. E. 342.

Something was said in the case as to there being a mutual mistake. I think there can be no serious question on that point, and that it is not well taken on behalf of the defendant. There was not, within the meaning of the law, a mistake in this transaction, such as would in any way defeat or affect the contracts.

My decision, to recapitulate, therefore, is this:

First. The contracts are not voidable but are in full force and effect.

Second. The request of the plaintiff, that specific performance be adjudged herein, is refused.

Third. The temporary injunction was well within the discretion of the justice granting it, pending the trial of the action, and is not in its force and effect, during such pendency, disturbed.

Fourth. A further continuance of it for a reasonable time is permitted, until the machinery of the plaintiff's mills may be adjusted to the shutting off of the power, and may be provided for by the judgment entered upon this decision; but, beyond such reasonable time, further enjoining or mandatory order is refused.

The plaintiff succeeds in sustaining the validity of its contracts, but fails in its demand for specific performance. The defendant had no right to say it would refuse to carry out its contract, or serve a notice to that effect. Consequently, neither party has entirely succeeded, and taxable costs are not awarded to either as against the other.

Judgment accordingly.

---

(151 App. Div. 184.)

GLOBE WOOLEN CO. v. UTICA GAS & ELECTRIC CO.

(Supreme Court, Appellate Division, Fourth Department. May 29, 1912.)

CORPORATIONS (§ 401*)—CONTRACTS—VALIDITY.

A contract between two corporations, under which the plaintiff received unconscionable benefits from the defendant electric company, may be rescinded by defendant, where the president of plaintiff company was an influential director of defendant light company, and, though not financially interested in defendant, he took part in the negotiations for the contract and by his silence approved of it when it was ratified by the directors.