(151 App. Div. 184.)

GLOBE WOOLEN CO. v. UTICA GAS & ELECTRIC CO.

(Supreme Court, Appellate Division, Fourth Department. May 29, 1912.)

CORPORATIONS (§ 401*)—CONTRACTS—VALIDITY.

    A contract between two corporations, under which the plaintiff received unconscionable benefits from the defendant electric company, may be rescinded by defendant, where the president of plaintiff company was an influential director of defendant light company, and, though not financially interested in defendant, he took part in the negotiations for the contract and by his silence approved of it when it was ratified by the directors.

    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1363, 1364, 1595; Dec. Dig. § 401.*]

Appeal from Special Term, Oneida County.

Action by the Globe Woolen Company against the Utica Gas & Electric Company. From a judgment denying specific performance (136 N. Y. Supp. 16) and affirming the validity of a contract, defendant appeals. Reversed and remanded.

This is an action in equity commenced on the 12th day of November, 1910, to compel the continued specific performance by the defendant of two certain contracts during the periods specified in such contracts and of any extension thereof made pursuant to their terms, entered into by and between the parties to this action and which are alleged by the plaintiff to be valid, legal, and binding in all respects, and to obtain a permanent injunction restraining the defendant from discontinuing performance thereof; it being alleged that the plaintiff has no adequate remedy at law.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The defendant by its answer admitted making the contracts, denied that plaintiff did not have an adequate remedy at law to obtain the relief, if any, to which it was entitled, and alleged, in substance, that such contracts were grossly inequitable and unconscionable as to the defendant; that it was induced to enter into the same by unfair means, resulting from the fact, among others, that the plaintiff's president, who was its principal stockholder, and therefore largely interested in it financially, and who negotiated said contracts for the plaintiff, was at the time and during all the times in question a director of the defendant, chairman of its executive committee, actively participated in the conduct of its business, and was influential in the control and management of its affairs, and so although he had practically no financial interest in the defendant, he being the owner of only one share of its capital stock.

It is further alleged that such contracts were negotiated for and on behalf of the defendant by the general manager of its electrical department, and, in substance, that close and friendly relations existed between him and plaintiff's president; that such general manager usually attended the meetings of the executive committee, of which the plaintiff's president was chairman and presided over; that the data which he first obtained in respect to the operation of plaintiff's plant and business was the result of investigation which he made at the instance and request of the plaintiff's president while in defendant's employ and without its knowledge or consent; and that he was paid for such investigation $150 by the plaintiff through its president.

It is further alleged, in substance, that because of the relations existing between such negotiators, because of the position which the plaintiff's president occupied in defendant, the office which he held, and the relations which he thereby sustained to the members of its board of directors and to the other members of its executive committee, of which he was chairman, he was able to and did very largely influence the action of the defendant in the premises, and, in substance, that the plaintiff's president in negotiating the contracts in question was seeking and willing to obtain great advantage to the plaintiff and, indirectly, to himself, and that either in ignorance of or not caring what the result of such contracts would be to the defendant, in which he had no financial interest, he permitted them to be approved, notwithstanding that by virtue of his office and position therein he was required to be vigilant in protecting its interests.

It is further alleged that such contracts were entered into because of a mutual mistake as to the facts, and that the plaintiff's president failed to disclose to defendant's executive committee certain material facts which were then within his knowledge, and which, had they been disclosed, would have prevented the consummation of such contracts by the defendant.

It is further alleged that such contracts are illegal and void because against public policy, and that their continued performance would be in violation of law.

The defendant demands judgment that the contracts in question be declared null and void and that the complaint be dismissed, with costs.

The issues thus raised by the pleadings were tried at the February, 1910, Special Term of the Supreme Court. A decision was rendered, consisting of findings of fact and conclusions of law, upon which judgment was entered, and which decreed, in substance: (1) That the contracts which are the subject of this litigation are "valid and binding contracts." (2) That by the service of certain notices upon the defendant "said contracts were extended for a term of five years." (3) "That a decree for the specific performance of said contracts be and the same is hereby refused." (4) "That the temporary injunction granted herein on November 12, 1910, be and is hereby continued in force and effect for 30 days after the entry of this judgment." (5) "That neither party is entitled to costs of this action as against the other."

From such judgment this appeal is taken.

Argued before McLENNAN, P. J., and SPRING, KRUSE, ROBSON, and FOOTE, JJ.

Pardon C. Williams, of Watertown, for appellant.
James F. Hubbell, of Utica, for respondent.

McLENNAN, P. J. (after stating the facts as above). From the opinion of the learned trial court we learn that specific performance of the contracts in question, although adjudged to be valid, and binding upon the defendant, was refused because:

"The contracts are burdensome to the defendant; it is largely a public service corporation, furnishing for the use of the people at large gas and electric power. Under its contracts with the plaintiff, it must, under certain conditions, shut off its supply to all others but the city of Utica and the plaintiff. It has already lost many thousands of dollars and inevitably, if specific performance is awarded, must lose much more; if action is brought against it for breach of contract, it may be called upon to respond in payment of substantial damages. * * * The plaintiff has its common-law right of action for damages if there is a breach of contract on the part of the defendant, and I deem it more in line with the promotion of justice to leave the parties to their law remedies in this case, rather than to attempt to force literal performance of a harsh and iron-sided contract. However capable the men were who entered into it, and however much consideration they gave it, the truth remains that the contracts are not in terms evenly balanced between the parties and are bound to bring great loss to the defendant."

For the reasons thus stated by the learned trial court, and others urged by the defendant, to which attention will be called, it insists that the court was in error in adjudging that "the contracts are valid and binding contracts." If they are, it is of no practical advantage to the defendant that their specific performance was not decreed in this action, because the damages recoverable, if any, in an action at law would be measured by the value of such specific performance to the plaintiff.

At the outset it is important to ascertain how the contracts in question came to be made and what rights were acquired by and obligations imposed upon the respective parties thereby.

Each of the parties to this action was at all the times mentioned a domestic corporation, having its principal office and place of business in the city of Utica, N. Y. The plaintiff operated two mills, designated in the record as the "worsted" and "woolen" mill, respectively, and connected with each and operated in conjunction therewith was a dyehouse and other appurtenances. The plaintiff was engaged in the manufacture of cloth and yarn in said plant, and prior to the time when the contracts in question were made and the defendant entered upon their performance, respectively, the necessary power for the operation of said plant was obtained by steam, generated by the plaintiff in its own boilers and equipment, and the mills were heated and the dyehouses operated by means of exhaust steam; practically all the steam required for such purposes being supplied by the operation of the steam plant which generated the power for the operation of said mills. During that time a portion of the plant was lighted by electricity furnished by the defendant. The capital stock of the plaintiff was $300,000, and during all the times mentioned Mr. J. F. Maynard was its president and took an active part and interest in its manage-

ment and operation. He owned $90,000 of the par value of the capital stock, the largest single owner, and thus his financial interest in the plaintiff and indirectly his individual interest alike urged him to secure for it and himself the most favorable contract possible.

The defendant was engaged in manufacturing gas and generating electricity to be supplied to the city of Utica and its inhabitants for power and lighting purposes. Mr. Maynard, plaintiff's president, was one of its directors, being selected as such by the holders of the majority of its capital stock. A Mr. Beardsley, Maynard's brother-in-law, was in like manner elected a director. Practically, neither of them had any financial interest in the defendant, as they each owned only one share of stock which was transferred to them to enable them to qualify as directors. They were both made members of defendant's executive committee and for some years prior to the making of the contracts in question constituted a majority thereof, and under the by-laws of the defendant such committee was practically supreme in the management of defendant's affairs and business. Before and at the time the contracts in question were consummated, other directors of the defendant were added to its executive committee; but Mr. Maynard continued to act as its chairman, presided at its meetings, and continued by reason of his position to be influential in determining the action respecting any propositions which came before it, not only because of his office and the position which he occupied as chairman of such committee, but also because of the relations which he sustained to the members of the directorate and because of the relations which he sustained to the other members of the executive committee. So that it appears that Mr. Maynard was president of the plaintiff and had a large financial interest in its success and presumably was largely interested and influential in the conduct and management of its affairs; that he was also a director of the defendant corporation and chairman of its executive committee, and, although he had substantially no financial interest in it, his duties as director and as a member of the executive committee and its chairman required that he should be equally vigilant to protect its interests, vigilant to see to it that the defendant entered into no contract which resulted in substantial benefit to the plaintiff and to himself and which was inequitable, burdensome, and unconscionable as to the defendant.

The contracts in question resulted from certain letters which passed between Mr. Maynard, plaintiff's president, and Mr. Greenidge, the general manager of defendant's electrical department. The first letter was dated October 18, 1906, was written by Mr. Greenidge, as general manager of the defendant, to Mr. Maynard, as plaintiff's president, and related to the worsted mill, so called. By such letter the defendant submitted a proposition to the plaintiff by which it agreed, in substance, to install in plaintiff's worsted mill the necessary transformers, wiring, belts, etc., for supplying said mill with sufficient power to operate and light the same at a maximum rate of .0104 per kilowatt hour; all the electrical equipment so installed to be paid for by the plaintiff. The defendant also agreed to guarantee to the plaintiff that the cost to it of coal for heating the mill and dyehouse, to-

gether with the wages of one mechanic and one fireman and the cost of operating and lighting the mill with electricity supplied by the de-defendant, would be $300 less for each month than the total cost to the plaintiff had been for furnishing the power, light, and heat for said mill and the operation of the dyehouse connected therewith for the corresponding month in the previous year.

By letter dated October 20, 1906, written by the plaintiff's president, the proposition so submitted was tentatively accepted and was finally accepted by letter dated June 27, 1907, which stated more in detail the terms of the acceptance. The contract so made was to cover a period of five years with the privilege to the plaintiff of extending it for a further term of five years upon the same terms. Thereupon and prior to March 17, 1907, the electrical machinery was installed in the worsted mill pursuant to the terms of the contract, and the defendant commenced to furnish such mill with the electricity required for power and light. While the machinery was being installed in the worsted mill, defendant's manager and plaintiff's president entered into negotiations looking to the making of a similar contract for equipment and furnishing power and light for the woolen mill, and under date of February 9, 1907, defendant's manager wrote to plaintiff's president proposing to equip and furnish power to operate and light the woolen mill, including the other mills, warehouse, offices, etc., except the worsted mill, upon the same terms as were contained in the contract relating to the worsted mill, and by such proposal the defendant agreed that, if accepted, and the contract was entered into, it would guarantee to save the plaintiff $300 per month in the operation of the woolen mill, the same as was stated in the proposal concerning the worsted mill. This proposed contract was also to continue for a period of five years, with the privilege to the plaintiff of extending it for an additional term of five years on the same terms.

In this proposal a proposition was inserted which did not appear in the proposal for the contract relating to the worsted mill, which was in effect that, in the event of any accident to the defendant's plant preventing the furnishing of power to all its customers, it would agree to furnish power to the plaintiff before any other customer, except the city of Utica, for its municipal contract. By letter dated February 9, 1907, the proposal for contract relating to the woolen mill was tentatively accepted, and also under date of June 27, 1907, by a letter written by plaintiff's president, such proposal was finally accepted. Prior to January 20, 1908, the woolen mill had been equipped pursuant to the terms of such last-mentioned contract, and the defendant had commenced furnishing to the mill the electricity for the required power and light. At at least two meetings of the defendant's executive committee, held prior to its approval of such contracts and at which its proposed action was being considered, plaintiff's president was present and presided. Defendant's manager, who with such president had negotiated such contracts, was also present, and he was asked, in substance, if such contracts were proper and advantageous to the defendant. He assured the committee that they were, and thereupon they were approved; each member of the committee voting in

the affirmative, except plaintiff's president, who took no part in the discussion and did not vote upon the question of approval. Neither did he in any manner dissent from the action so taken by his colleagues. Indeed, he could not well have protested, because such contracts were negotiated by him and thereby had received his approval, and the other members of the executive committee had the right to assume that he would not negotiate and submit contracts for its approval which were grossly inequitable, unduly burdensome, and altogether unconscionable as against the defendant. They had the right to assume that he would not bring about such result knowingly or permit the same to be consummated because of his ignorance of the facts in the premises. He knew, or in the discharge of his duty as an officer of the defendant ought to have known, the result of such contracts to the defendant when he negotiated the same and they were presented for approval to the executive committee, of which he was chairman and an influential member.

The result of such contracts, as pointed out in the opinion of the learned trial court, was exceedingly disastrous to the defendant. Under their provisions, from the time the defendant entered upon their performance, respectively, up to the 1st day of February, 1911, it had furnished to the plaintiff, at the price specified in the contracts, namely, .0104 per kilowatt hour, electricity of the value of $69,500.75 for nothing, and was, in addition, owing to it $11,721.41 for the privilege, as might be said, of furnishing to it such electricity. The accuracy of these figures is conceded, and it is practically further conceded that, if such contracts are held to be valid and binding to the end of the 10-year period, the defendant will be compelled during all of such time to furnish the electricity required by the plaintiff for nothing and, in addition, will be obligated to pay to it a substantial sum annually. The accuracy of such statement and of the computations leading to such result is not questioned, but is conceded by the plaintiff, and, as before suggested, if specific performance is not decreed and plaintiff is entitled to maintain an action at law for the breach of such contracts, the damages recoverable would be measured by the value to it of such electricity, and, in addition, the sum of $7,200 per year, guaranteed to it under such contracts.

In this connection it should be stated that, after the defendant had become fully aware of the nature of the contracts and that by their terms the defendant was obligated to supply to the plaintiff all the electricity which it required in its mills for power and light for nothing, and, in addition, to pay to it a considerable sum annually, it sought to be relieved from the performance of such contracts and the burdens imposed thereby, and thereupon negotiations looking to such result were commenced between the parties. The defendant offered to remove from plaintiff's mills, without cost to the plaintiff, all the electrical equipment which it had installed, and to repay to the plaintiff whatever sums it had paid to the defendant for such equipment and its installation, or to allow the plaintiff to retain the equipment so installed, or such portion of it as it might desire, upon reimbursing the defendant for the cost to it of such equipment or the portion so re-

tained, and the defendant also offered to reinstall, at its own cost, the boilers and necessary equipment to enable the plaintiff to furnish its mills with power produced by steam, precisely as it had done prior to the making of the contracts in question. All such propositions so made were rejected by the plaintiff, except that it permitted the defendant to reinstall the steam plant in said mills, which it did at a cost to it of about $18,000; but it was expressly agreed that such consent given by the plaintiff and the action of the defendant thereunder should in no manner affect the right of the plaintiff to insist that the contracts were valid and binding and that the defendant was irrevocably obligated to specifically perform the same, and the plaintiff did not accept either of the propositions so submitted to it, but instead served notice upon the defendant that it exercised its option to extend such contracts for the period of five years, pursuant to their terms. It therefore appears that the defendant, before the commencement of this action, sought to terminate the contracts which it ignorantly or inadvertently, and largely through the influence of plaintiff's president, entered into, and to place the plaintiff in precisely the same position which it occupied before the making of such contracts, without cost or expense to it. As before suggested, all such propositions were rejected by the plaintiff, and it insists that such contract shall be specifically performed, regardless of the result to the defendant; or that in any event such contracts shall be held to be valid and binding as against the defendant as decreed by the judgment herein, and that, as stated in the opinion of the court below, the plaintiff is entitled to recover in an action at law the value to it of the specific performance of such contracts.

Considering the character of the contracts, which have been described, and the manner and circumstances under which they were negotiated and approved by the defendant, the fact that the chief negotiator on behalf of the plaintiff was personally and financially interested in it, and that, while he had no financial interest in the defendant, he acted as the chief officer of its executive committee, and under his management and control such contracts were consummated and approved by the defendant, it is important to inquire whether or not under the law such contracts are irrevocably binding upon the defendant, or whether it had the right, at its option, to repudiate the same upon placing the plaintiff in the same position which it occupied before the making of such contracts, and so that no actual damages could result to the plaintiff by reason of defendant's repudiation of such contracts.

In one of the early cases in this state (New York Central Insurance Co. v. National Protection Insurance Co., 14 N. Y. 85) it was held:

"In making a contract requiring the exercise of judgment or discretion, a person cannot act as the agent of both parties; and where he undertakes to do so, a court of equity will avoid the contract on the application of either of the parties."

It was further held in that case that a contract negotiated by an agent of the plaintiff, who at the same time acted as the agent and represented the defendant, was void or voidable at the instance of

the party aggrieved. In the case at bar it is apparent that the plaintiff's president, through his influence in the management of the defendant corporation and through his influence as a member of its executive committee, procured or permitted the contracts in question to be entered into, which were of great advantage to the plaintiff and to himself personally, but which were unduly burdensome upon and altogether unconscionable as to the defendant.

In Hoyle et al. v. Plattsburgh & Montreal R. R. Co. et al., 54 N. Y. 314, 13 Am. Rep. 595, it was held:

"The office of a director of a railroad company is fiduciary in its character, and, in consequence, a director is incapacitated from dealing, in his own behalf, in respect to the corporation property or in respect to any matters involving his powers and duties as such director."

Judge Johnson, in discussing the duties of a director of a corporation to which he is elected as such, said:

"Whether a director of a corporation is to be called a trustee or not, in a strict sense, there can be no doubt that his character is fiduciary, being intrusted by others with powers which are to be exercised for the common and general interests of the corporation, and not for his own private interests. He falls, therefore, within the great rule by which equity requires that confidence shall not be abused by the party in whom it is reposed, and which it enforces by imposing a disability, either partial or complete, upon the party intrusted to deal, on his own behalf, in respect to any matter involved in such confidence. (Cases cited.) Nor is it possible to limit the duty of a director of a corporation, in this respect, to the time while he is acting as a director under any special delegation of power, or is in attendance at meetings of the board. Such a limit would deprive the rule of almost all its efficacy, and would facilitate innumerable evasions of its force. That the power of a director to act for or to represent the corporation may be so limited, in respect to its being bound by his acts, does not furnish any ground for saying that his fiduciary character and consequent duties are subject to the same limit. On the contrary, these must be held to continue so long as his directorship continues. He cannot, while director, divest himself of the knowledge which he has acquired in confidence of corporate affairs, or of the value of corporate property, nor be allowed to use it to his own advantage. Cumberland Coal Co. v. Sherman, 30 Barb. 568–572, and the cases there cited; Benson v. Heathorn, 1 Young & Col. 326. The application of these principles to the case in hand would lead to the conclusion that Vilas, while director, and in view of that relation only, could not become the purchaser of the property of the corporation, except subject to its right to elect to disaffirm the sale and demand a resale. As director, it was his duty to prevent a sale if possible; and, if not, then to endeavor to have the property produce the highest price; and in order to the attainment of these objects, to use the knowledge he had derived from the confidence reposed in him as director. As purchaser, on the other hand, it was his interest to pay as little as possible, and to use his special knowledge for his own advantage. Actual fraud or actual advantage do not need in such cases to be shown. Ex parte Lacey, 6 Vesey, 627, and Owen v. Foulkes, stated in note 1 to that case."

In the case at bar it was the duty of plaintiff's president, he being at the same time a director of the defendant, a member of its executive committee, and chairman of such committee, to see to it that the best possible contract was negotiated on behalf of the defendant or, at least, that a contract which was fair and equitable between him and the defendant was so negotiated and approved.

In Barnes v. Brown et al., 80 N. Y. 527, it was held, in substance,

that the plaintiff, who was a director of a corporation, would not be permitted to make a profit to himself in his dealings with such corporation.

In Duncomb v. N. Y., H. & N. R. R. Co., 84 N. Y. 190, it was held:

"The director of a corporation occupies a fiduciary position, and cannot deal in his own behalf in respect to matters involving the trust. The right of the corporation to avoid such dealings does not depend upon the bad faith of the director. But the acts of the director, in violation of this rule, cannot be avoided, in the absence of proof of his bad faith, without restoring to him what the corporation has received."

Again, in the case at bar it appears most conclusively that Mr. Maynard, as director of the defendant corporation, who occupied a fiduciary capacity therein, was dealing in his own behalf (he being the principal owner of the stock of the plaintiff corporation) in negotiating the contracts in question and in respect to matters involving the trust assumed by him as director and chairman of the executive committee of the defendant corporation, and that the defendant offered to restore to him and to the plaintiff corporation all the advantages which it received by virtue of such contracts and offered to place the plaintiff in precisely the same position in which it was before said contracts were entered into.

In the case of Munson et al. v. S. G. & C. R. R. Co., 103 N. Y. 59, 8 N. E. 355, it was said:

"A trustee cannot, in his representative capacity, purchase property in which he is personally interested. The law does not stop to inquire whether such contract of purchase was fair or unfair. It stops the injury when the relation is disclosed by setting aside the transaction or refusing to enforce it at the instance of the party whom the trustee represents."

In the case at bar plaintiff's president, who was trustee of the defendant, did not purchase property of the defendant in which he was personally interested, but he negotiated a contract with such defendant in which he was personally interested and which resulted to the great disadvantage of the defendant, which by virtue of his office and position he represented. Nor is it important that plaintiff's president in the transaction in question represented the defendant silently; that he did not openly advocate or vote for the adoption of the contracts. His negotiation of the same implied and carried with it the force and effect of his approval.

In the case of Barr et al. v. N. Y., L. E. & E. W. R. R. Co. et al., 125 N. Y. 263, 26 N. E. 145, it was said:

"While the rule which forbids persons who fill fiduciary positions from using them for their own benefit is strict in its requirements and extends to all transactions where the individual's personal interest may be brought into conflict with his acts in a fiduciary capacity, and works independently of the question whether there was fraud or good intention, it does not operate to avoid ab initio all transactions of a trustee where he is interested, but it is generally limited in its operation to rendering them voidable at the election of the party whose interests are concerned; and so, if nothing is done in avoidance, the transaction remains undisturbed."

In this case, as we have seen, the plaintiff's president was acting in a fiduciary capacity in defendant and had negotiated and submitted

to it for its approval a contract which was largely for his individual benefit and advantage and greatly to the disadvantage of the defendant, and therefore, as held, the contracts were voidable at the election of the defendant and so independently of the question whether there was fraud or good intentions on the part of the plaintiff's president in bringing about their consummation.

It would seem to be unnecessary to multiply the citation of authorities in support of the proposition that where contracts are made or entered into between two corporations under the circumstances disclosed by the evidence in this case, and the result thereof is that the contracts are greatly to the advantage of the plaintiff and to its president individually, who negotiated the same, and are grossly inequitable, burdensome, and unconscionable as to the other party thereto, in which such negotiator was a director, chairman of its executive committee, and influential by reason of his position in its management, such contract may be repudiated at the option of the party aggrieved thereby, and if such repudiation is accompanied by an offer by the aggrieved party, the defendant in this case, to place the other party, the plaintiff, in the same position in which it was before the making of such contracts, they thereby cease to be valid and binding and are not enforceable either in an action at law or in equity.

We conclude, therefore, that the contracts in question, under the facts and circumstances disclosed by the evidence, were voidable at the instance of the defendant, and that the trial court should have decreed their cancellation upon the defendant repaying to the plaintiff whatever it had received for the installation of electrical equipment, and placing the plaintiff's mills in the same condition to be operated as they were before the contracts were entered into.

Having reached this conclusion, we think it unnecessary to discuss the other questions presented upon this appeal.

The judgment, so far as appealed from, should be reversed, and a new trial granted, with costs to the appellant to abide the event.

Judgment reversed, and new trial granted, on questions of law and fact, with costs to the appellant to abide the event. All concur; SPRING and ROBSON, JJ., in result only.